Charles Turner and Emma R. Turner v. Commissioner. Turner Enterprises, Inc. (a dissolved corporation) v. Commissioner.
Turner v. Commissioner
Docket Nos. 1603-63, 1604-63, 1605-63. .
United States Tax Court
T.C. Memo 1965-101; 1965 Tax Ct. Memo LEXIS 231; 24 T.C.M. (CCH) 544; T.C.M. (RIA) 65101; April 15, 1965
Arthur B. Willis, Wilflower Bldg., Los Angeles, Calif. and Stephen A. Bauman, for the petitioners. Michael P. McLeod, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in income tax of petitioners Charles Turner and Emma R. Turner, Turner Enterprises, *234 Inc. (a dissolved corporation) and Charles Turner and Emma R. Turner, as transferees of Turner Enterprises, Inc. in the amounts and for the years as follows: Charles Turner and Emma R. Turner Docket No. 1603-63 Proposed
Taxable Year Ended
Deficiency
Totals
December 31, 1957
$118,053.92
December 31, 1958
333,087.44
December 31, 1959
248,438.77
December 31, 1960
378,787.29
$1,078,367.42 Turner Enterprises, Inc. (A dissolved corporation) Docket No. 1605-63 Proposed
Taxable Year Ended
Deficiency
Totals
December 31, 1957
$ 1,614.33
December 31, 1958
40,980.91
December 31, 1959
39,244.77
December 31, 1960
43,068.77
$ 124,908.78 Charles Turner and Emma R. Turner, as transferees of Turner Enterprises, Inc. Docket No. 1604-63 December 31, 1957
$ 1,614.33
December 31, 1958
40,980.91
December 31, 1959
39,244.77
December 31, 1960
43,068.77
$ 124,908.78
The issues presented are (1) whether Turner Enterprises, Inc. was a partner in the Park Beverage Company so that an allocable part of Park Beverage Company's earnings is taxable to Turner Enterprises, Inc. rather than to Charles Turner, and (2) if Turner *235 Enterprises, Inc. was a partner in Park Beverage Company, whether Turner Enterprises, Inc. was a corporation availed of for the purpose of avoiding income tax with respect to its shareholder by permitting earnings and profits to accumulate instead of being distributed. Findings of Fact Some of the facts have been stipulated and are found accordingly. Charles Turner and Emma R. Turner are husband and wife and reside in Beverly Hills, California. They filed joint income tax returns for the years 1957, 1958, 1959, and 1960, with the district director of internal revenue at Los Angeles, California. Petitioner Charles Turner sometimes will be referred to hereinafter as Turner. Turner Enterprises, Inc., hereinafter rereferred to as Enterprises, was a California corporation incorporated on March 21, 1957. Enterprises filed corporation income tax returns for the calendar years 1957, 1958, 1959 and 1960 with the district director of internal revenue at Los Angeles, California. Enterprises was incorporated in 1957 with an authorized capital stock of 200,000 shares with an aggregate par value of $200,000. Enterprises issued 50,000 of its shares to Turner upon his payment of $50,000 *236 to the corporation in June 1957. During the years in issue Turner was the sole shareholder of Enterprises. Partnership Issue Continuously since 1949 and throughout the years here involved, Turner was a general partner in a series of limited partnerships each one of which was known as Park Beverage Company, hereinafter sometimes referred to as Park. Except for a short period of time not here in issue, Turner was the only general partner. The composition of partners in Park was changed by the execution of new partnership agreements in 1945, 1947 and 1950. Turner's interest in each of these limited partnerships varied from approximately 20 percent to 60 percent. The business of Park was the distribution of beer. Each of the Park partnerships commenced business with a stated capital investment of $25,000. The $25,000 capital investment in each instance was not adequate to permit Park to operate. Therefore, on every reorganization the new partnership operated on the undistributed earnings of the preceding partnership until the new partnership's earnings plus its capital were sufficient to permit it to pay out the undistributed earnings belonging to the partners of the preceding partnership. *237 On February 28, 1957, the credit balances in the capital accounts and undistributed profits accounts of the partners operating under the 1950 Agreement (hereinafter referred to as 1950 Park) as reflected in its accounting records were as follows: General Partner -
Charles Turner
$379,114.51
Limited Partners -
Marilyn Avila
31,577.61
Jeannette Selvage
31,577.61
Carol Jane Kilner
84,257.81
Frederick W. Ackerman,
Jr.
84,257.81
Total
$610,785.35
1950 Park was succeeded by a new limited partnership under an agreement dated April 3, 1957. There were four new partners in this partnership, namely: Enterprises, Ina Corporation, Conrad Rosemont and Howard Rettberg. None of the four new partners had ever been a member of any prior Park partnership. The partnership agreement, made pursuant to the Uniform Limited Partnership Act of the State of California, provided that the shares of partnership profits and losses belonging to Enterprises and Turner were 32 percent and 10 percent, respectively. By the terms of the agreement each partner had a right to vote on the issue of expelling a partner or of terminating the partnership, and the agreement further provided *238 that upon termination of the partnership, all of the partners who so desired should have the right to continue the partnership business and to retain and use its name and assets in conduct thereof. The capital contributions to the new partnership (hereinafter referred to as 1957 Park) and the dates of the capital contributions as reflected in the partnership's accounting records were as follows: Amounts
Dates
General Partner -
Charles Turner
$ 2,500.00
Aug. 21, 1957
Limited Partners -
Jeannette Selvage
1,125.00
Aug. 21, 1957
Marilyn Avila
1,125.00
Aug. 21, 1957
Carol Jane Kilner
2,500.00
Aug. 21, 1957
Frederick Ackerman,
Jr.
2,500.00
Aug. 21, 1957
Turner Enterprises,
Inc.
8,000.00
Sept. 16, 1957
Ina Corporation
5,000.00
Sept. 16, 1957
Howard O. Rettberg
1,125.00
Sept. 16, 1957
Conrad D. Rosemont
1,125.00
Sept. 16, 1957
Total
$25,000.00
The capital contributions of the five "old" partners (Turner, Jeannette Selvage, Marilyn Avila, Carol Jane Kilner and Frederick Ackerman, Jr.) were made by their endorsing and delivering checks drawn on August 20, 1957, to them by 1957 Park to apply on amounts owed by 1957 Park to the partners *239 of 1950 Park. The capital contributions of the four "new" partners (Enterprises, Ina Corporation, Rettberg, and Rosemont) were made with checks dated September 16, 1957, drawn by 1957 Park to those partners (along with additional checks drawn to both the old and new partners of 1957 Park) as a distribution of profits earned by 1957 Park during the period commencing March 1, 1957. The capital contributions to 1957 Park were not adequate to permit it to operate the business. Until its undistributed current earnings, along with the $25,000 of capital contributions, had sufficiently accumulated to finance operations of the partnership, 1957 Park operated on undistributed earnings belonging to the partners of 1950 Park. The amounts of undistributed earnings payable to the partners of 1950 Park, as reflected in the accounting records of 1957 Park, were paid by 1957 Park as follows: 1957
March
$ 61,340.92
April
65,000.00
May
137,000.00
June
112,000.00
July
112,000.00
August
127,591.76
$614,932.68
Less: Journal Adjustment entries
4,147.33
Total
$610,785.35
The assets of 1950 Park were transferred to 1957 Park by means of an assignment by Turner from *240 himself as former general partner of 1950 Park to himself as general partner of 1957 Park. 1957 Park complied with all the requirements of California law respecting formation of a limited partnership. A certificate of formation of limited partnership was duly recorded with the County Recorder for Los Angeles County, in accordance with the requirements ofounty, in accordance with the requirements of California law. A certificate of transacting business under fictitious name was duly published in accordance with California law. Enterprises, along with all other limited partners, was shown as a limited partner in 1957 Park in letters and permit applications to various Federal and State regulatory agencies. Park's beer distribution business was carried out under agreements entered into by it with the Lucky Lager Brewing Company. The agreement in effect on March 1, 1957, was entered into by the parties on January 1, 1955, and provided that Park would continue as the exclusive distributor of Lucky Lager beer in the Los Angeles area for the next 10 years. The agreement further provided generally that Park would conduct its distribution business in an efficient and competitive manner *241 and that failing this, or if Park should become bankrupt or start to distribute products of a competing manufacturer without Lucky Lager's consent, Lucky Lager could terminate the agreement. 1957 Park continued business through February 28, 1959. Enterprises acquired Rettberg's interest in 1957 Park effective as of March 1, 1959. Enterprises paid Rettberg on March 31, 1959, the amount of $21,117.56 for Rettberg's 4 1/2 percent interest in Park. This was made up as follows: Capital account in Park
$ 1,125.00
Undistributed share of profits of
1957 Park
14,955.04
Interest payable by Park on Rett-
berg's capital
37.52
Profit to Rettberg
5,000.00
Total
$21,117.56
With the acquisition of Rettberg's partnership interest by Enterprises, a new partnership agreement was entered into by the remaining partners, effective March 1, 1959. The 1959 agreement had the same general provisions as the 1957 agreement with the exception that Enterprises' interest in the profits and losses of the new partnership (hereinafter sometimes referred to as 1959 Park) was 36.5 percent instead of 32 percent. A statement of partnership, a certificate of limited partnership, and a certificate *242 of business fictitious firm name were all duly filed or published on behalf of 1959 Park. Continuously from January 1, 1945, until February 28, 1957, the various Park partnerships made payments to another business known as Security Products. These payments were of amounts equal to 42 percent of Park's operating profit and the payments purported to be for services and benefits that Security Products would confer upon Park. In fact Security Products rendered little or no services to Park and the arrangement was made by Eugene Selvage, the president of Lucky Lager Brewing Company, to permit certain "Northern interests", whose specific identity and interests were not known to Turner, to participate in Park's profits. The net income of 1950 Park, the payments made to Security Products by 1950 Park, and the net income of 1950 Park before payment to Security Products, for the period July 1, 1950, through February 28, 1957, by accounting periods, were as follows: Net
Payments to
Net Income Before
Fiscal Year
Income of
Security
Payments to
Ended June 30
1950 Park
Products
Security Products
1951
$414,668.83
$300,277.45
$ 714,946.28
1952
410,228.04
297,061.69
707,289.73
1953
566,297.81
410,077.74
976,375.55
1954
548,932.40
397,502.79
946,435.19
1955
550,546.04
398,671.26
949,217.30
1956
737,340.92
533,936.55
1,271,277.47
Period July 1, 1956
to February 28, 1957
524,444.43
379,770.12
904,214.55
*243 The payments to Security Products by 1950 Park terminated as of February 28, 1957, and no payments were made to Security Products by 1957 or 1959 Park. The net income of 1957 Park and 1959 Park from March 1, 1957, through October 31, 1960, by accounting periods, was as follows: Period March 1, 1957, through June 30, 1957
$ 406,866.99
Fiscal year ended June 30 -
1958
1,191,452.76
1959
897,667.63
1960
731,859.24
Period June 1, 1960, through October 31, 1960
257,431.74
Cash distributions of the profits of 1957 and 1959 Park were made to the partners each month commencing in September 1957, and running through October 1960. Each of these distributions was made to the partners in the ratios of their interest in profits of the partnership. Capital was a material income producing factor in both 1957 and 1959 Park for all of the taxable years involved in this case. Accumulated Earnings Tax Issue Turner's principal purpose in forming Enterprises was to have a corporation as a limited partner in Park. One of Turner's reasons for wanting to put part of his interest in Park in a corporation was because Turner himself was in a higher income tax bracket than *244 the 52 percent rate applicable to corporations. The Articles of Incorporation of Enterprises provided in part that: This corporation intends to engage initially in the primary business of operating a business of data processing to provide business information to various companies, to acquire and operate a stable of racing or breeding horses, to acquire and operate a ranch for use in connection with stabling and breeding thoroughbred horses, to invest in a partnership for the purpose of distribution of beer in Southern California, to acquire, improve and rent real property, and to acquire, hold and develop oil properties. Initially Turner, his wife, and Rosemont were the three directors of Enterprises and they also were its president, vice-president, and secretary-treasurer, respectively. On October 11, 1960, Rosemont was removed as as director and officer of the corporation. During the last 3 months of 1957 and during the first half of 1958 Enterprises received gross income of $1,900 and $7,350, respectively, from a statistical services business which Enterprises conducted with rented equipment. The equipment used by Enterprises was installed on property owned by Park, adjoining *245 Park's office, and Park was Enterprises' only customer. The major piece of equipment was a Remington Rand Business Machine. On May 20, 1957, Enterprises purchased for $19,317 ten acres of unimproved land in Rialto, County of San Bernardino, California. Turner discussed with two realtors in Rialto the advertising of this property for lease either for the prospective tenant to build thereon or for the lessor to build to suit the tenant but never got a response. On July 10, 1957, Enterprises purchased for $16,402 a 1 1/2 acre lot in Flintridge, Los Angeles County, California. In June and October 1958 Enterprises purchased in all 3 lots near the corner of Fifth Street and Tujunga Boulevard in Burbank, California for a total purchase price of $41,113.11. There was a house on each of the 3 lots. Turner took a building contractor named Nester to look at these lots and discussed with him the possibility of building an apartment on these lots at a later time. Enterprises invested $127,808.40 on July 28, 1958, and $22,111.60 on October 27, 1958, as its original capital contributions, for a 65.67 precent interest in El Con, Ltd., a limited partnership. Enterprises was a general partner *246 in El Con, along with Rosemont and Hirshal, with Kingston Builders, itself a partnership, as a limited partner. Enterprises made additional capital contributions to El Con totalling $40,000 during 1959. The partnership agreement provided in part as follows: 6.3 The primary duties of JOHN HIRSHAL shall be to act as general contractor for any improvements which the partnership may erect. The primary duties of CONRAD ROSEMONT shall be to maintain the financial books and records of the partnership and to supervise the preparation and design of any improvements. All instruments executed on behalf of the partnership must bear the signature of CONRAD ROSEMONT. TURNER ENTERPRISES, INC. shall oversee and coordinate all business activities of the partnership and shall make available such managerial assistance as from time to time may be necessary or desirable to the partnership. 6.4 All partners other than JOHN HIRSHAL have business interests other than this limited partnership and shall not be required to devote their full time to the business of the partnership. In November 1960 Enterprises purchased Rosemont's interest in El Con, and thereafter had a 73.67 percent interest in El Con.
*247 El Con constructed a 34-unit class A apartment building in Burbank, California. The apartments were rented commencing in April 1959. For the calendar years 1959, 1960, and 1961, El Con's income and expenses were as follows: 1959
1960
1961
Gross rental income
$28,404.20
$47,433.36
$48,923.66
Less - Cash expenses
17,966.85
35,153.57
32,290.47
Net cash flow income
$10,437.35
$12,279.79
$16,633.19
Less - Depreciation deduction
27,742.40
27,763.28
20,740.43
Net taxable income (loss)
($17,305.05)
($15,483.49)
($ 4,107.24) Depreciation for income tax purposes, as reflected above, was computed using the double declining balance method with respect to its main assets. Had El Con computed its depreciation on the straight line method, it would have shown a total profit for the three years of $1,227.27. On June 24, 1958, Enterprises acquired one-half of the 22 percent interest of John Hirshal as a general partner in Burbank Tropicana Apartment, a limited partnership which owned and operated a 25-unit furnished apartment building in Burbank, California. On August 26, 1958, Enterprises paid $9,900 for this interest in the form of a check payable *248 to El Con, as part of Hirshal's capital contribution to El Con.
In January and March 1959 Enterprises purchased a total of six lots in Burbank, California, near the intersection of Third Street and Tujunga Boulevard, for an overall net cost of $98,282.14. Turner had owned race horses and some breeder mares for approximately five years before Enterprises was organized. During the year 1958, Enterprises purchased the following horses: Name of
Date of
Purchase
Horse
Purchase
Price
Porter
May 16
$15,000.00
Soft Caress
June 27
11,000.00
Shamadan
June 27
9,000.00
Great Dream
September 22
9,000.00
Redigal
September 22
6,000.00
Blue Wing Teal
September 22
6,000.00
Lovely Hardie
September 22
6,000.00
On October 1, 1958, Enterprises traded Porter to Turner for four mares, namely: Cover Joy, Waterwings, Bellegree, and Lucky's Darling. None of the horses acquired by Enterprises was entered in races. Turner individually owned horses that were entered in races. Enterprises' horses were kept at Ryan's Ranch where Turner's horses were also usually kept when they were not at the race tracks. The mares owned by Enterprises produced several colts. *249 The mares Great Dream, Redigal, Shamadan, Lucky's Darling, and Soft Caress, a yearling colt, and a filly were sold in January 1961 for $25,000. The balance of the mares and colts were distributed to Turner in liquidation of Enterprises. For the years 1958, 1959, 1960 and its last year ended June 13, 1961, Enterprises deducted expenses denominated "board, care and training" of breeding horses, in the amounts of $8,918.48, $19,238.56, $22,896.78 and $2,921.58, respectively. During 1958 Turner negotiated for the purchase of a ranch equipped for stabling horses. Turner inspected several ranches which were for sale and on one ranch he made successive bids of $140,000, $150,000 and $160,000. A check for $20,000 drawn by Enterprises was deposited in escrow on these offers. The negotiations did not result in the purchase of the ranch and no ranch was purchased during the years in issue by either Turner or Enterprises. Enterprises had assets, liabilities and surplus, all without regard to undistributed profits of Park, as of December 31, 1957, 1958, 1959 and 1960 in the amounts as follows: 1957
1958
Assets
Current Assets
Cash in Bank
$126,796.36
$164,134.37
Current receivables
9,547.44
738.71
Total current assets
$136,343.80
$164,873.08
Fixed Assets
Land
35,719.00
76,822.80
Buildings
Office Equipment and others
253.34
2,268.64
Total Fixed Assets
35,972.34
79,091.44
Investment in Partnerships,
etc.
Park Beverage Company
8,000.00
8,000.00
Tronus Corporation
El Con. Ltd.
147,852.53
Burbank Tropicana
8,689.44
Total investment in
8,000.00
164,541.97
partnerships
Investment in race norse
56,414.07
breeding operation
Long term installment notes
receivable
Other assets
720.12
3,033.94
Total assets
$181,036.26
$467,954.50
Liabilities
Current Liabilities
Federal income tax payable
$ 59,901.14
$137,073.24
Other taxes payable
5,410.96
9,496.55
Other current liabilities
105.00
Total current liabilities
$ 65,312.10
$146,674.79
Advances from Park Beverage
35,200.00
Company
Capital
Capital stock authorized
50,000.00
50,000.00
200,000 shares of $1.00 par
value issued and outstanding
- 50,000 shares
Earned surplus
Balance - preceding year
65,724.16
Net profit - current year
65,724.16
170,355.55
Total Earned Surplus
65,724.16
236,079.71
Total Liabilities, Capital
$181,036.26
$467,954.50
and Surplus
*250 1959
1960
Assets
Current Assets
Cash in Bank
$ 74,292.71
$246,196.53
Current receivables
8,811.81
26,452.24
Total current assets
$ 83,104.52
$272,648.77
Fixed Assets
Land
138,619.00
138,619.00
Buildings
34,318.97
31,883.34
Office Equipment and others
1,852.89
1,515.57
Total Fixed Assets
174,790.86
172,017.91
Investment in Partnerships,
etc.
Park Beverage Company
14,125.00
Tronus Corporation
5,000.00
El Con. Ltd.
168,578.98
Burbank Tropicana
8,834.93
Total investment in
196,538.91
187,096.99
partnerships
Investment in race norse
48,795.32
27,513.54
breeding operation
Long term installment notes
313,978.40
receivable
Other assets
2,251.14
1,843.76
Total assets
$505,480.75
$975,099.37
Liabilities
Current Liabilities
Federal income tax payable
$ 97,783.96
$138,794.92
Other taxes payable
518.57
60.00
Other current liabilities
4,416.14
Total current liabilities
$ 98,302.53
$143,271.06
Advances from Park Beverage
Company
Capital
Capital stock authorized
50,000.00
50,000.00
200,000 shares of $1.00 par
value issued and outstanding
- 50,000 shares
Earned surplus
Balance - preceding year
236,079.71
357,178.22
Net profit - current year
121,098.51
424,650.09
Total Earned Surplus
357,178.22
781,828.31
Total Liabilities, Capital
$505,480.75
$975,099.37
and Surplus
*251 Relations between Park and Lucky Lager were very good in 1957 and 1958; but deteriorated in 1959 and 1960 to the extent that, at one point, Lucky Lager threatened to take away Park's distributing franchise. The interests of Turner and Enterprises in 1959 Park were sold to Lucky Lager Brewing Company on October 31, 1960, for $547,000 plus an amount equal to 46 1/2 percent of Park's undistributed net profit for the period from June 1, 1960, to date of closing. The total sales price of the 36 1/2 percent interest held by Enterprises was $527,922.68. The adjusted basis as of October 31, 1960, for the 36 1/2 percent was $247,729.93, so that the gain on the sale was $280,192.75. There were no loans by Enterprises to Turner at any time during Enterprises' existence. Enterprises did pay certain bills for insurance, veterinarian's fees, and board and training fees that were allocable in part to horses owned by Turner, individually. Such charges in the net amount of $345.93, $552.43, and $552.43 were reflected on Enterprises' books as of December 31, 1958, 1959, and 1960, respectively. Turner paid Enterprises on June 9, 1961, the entire amount then due, which was $552.43. There were *252 no other advances or expenditures by Enterprises to or for the benefit of Turner individually. Except for the investment of $5,000 in the stock of Tronus Corp., Enterprises did not invest in the stocks or securities of any corporation nor in the obligations of the Federal Government, any State government, or the agencies and instrumentalities of the Federal and State governments. Pursuant to the plan of liquidation adopted on October 11, 1960, all of the assets of Enterprises, subject to its liabilities, were distributed to Turner in liquidation of Enterprises by June 7, 1961. During the period of its existence, Enterprises had no employees except for a tabulating machine operator for a period of about 6 months, and no salaries were paid to its officers. At no time during the years in issue did Enterprises make improvements on any real estate which it had purchased. During its entire corporate existence, Enterprises distributed no dividends to Turner its sole shareholder. Had Enterprises distributed to Turner as dividends amounts equal to its annual accumulated taxable income for each of the years in issue, Turner would have had additional taxes to pay, absent any deductions *253 or losses, which Turner might have been able otherwise to acquire or use, of $59,249, $132,821, $88,963, and $115,237 for the years 1957 to 1960, respectively. On January 25, 1963, a statement of grounds on which it relied to justify its accumulation of earnings and profits, made pursuant to section 534 of the Internal Revenue Code of 1954, was submitted on behalf of Enterprises. The statement submitted is incorporated herein by this reference. As depreciable property, Park listed on schedules attached to its partnership returns of income for its fiscal years ended June 30, 1957, through 1961, delivery equipment, delivery maintenance equipment, and leasehold improvements with an aggregate original cost or other basis for the respective years of $644,005.99, $725,791.03, $680,355.31, $678,973.79, and $682,678.79. On partnership returns of income filed by Park for its fiscal years 1957 through 1961 Enterprises' share of partnership capital at the beginning and end of the year, ordinary income, and withdrawals during the year were as follows: Capital account
Capital account
Year ended
at beginning
Ordinary
at end
June 30
of year
income
Withdrawals
of year
1957
$130,729.99
$130,197.44
1958
$130,197.44
381,014.53
$322,197.44
189,264.89
1959
189,264.89
298,208.70
363,816.90
125,607.44
1960
125,607.44
263,985.00
225,982.44
166,753.62
1961
87,423.02
*254 Turner is liable as transferee of the assets of Enterprises for any deficiency in income tax that may be determined against Enterprises. Respondent in his notice of deficiency to Charles and Emma Turner for the calendar years 1957, 1958, 1959, and 1960 increased their income as reported by the distributive share of partnership ordinary income, interest income, and capital gains of the Park Beverage Company reported by Turner Enterprises for each of those years. For the calendar year 1960 respondent increase capital gains reported by Charles and Emma Turner by the amount of $280,192.75 with the following explanation: It is determined that the gain of $280,192.75 from the sale of the partnership interest in the Park Beverage Company, reported by Turner Enterprises, Inc. as nontaxable, represents a long-term capital gain taxable to you. Respondent in his notice of deficiency to Turner Enterprises, Inc., for the calendar years 1957, 1958, 1959, and 1960 determined that the corporation was subject to the accumulated earnings tax under the provisions of section 531 of the Internal Revenue Code of 1954 for each of those years giving the following explanation: *255 It is held that you were availed of during the taxable years ended December 31, 1957, December 31, 1958, December 31, 1959, and December 31, 1960, for the purpose of avoiding the income tax with respect to your shareholders, by permitting earnings and profits to accumulate instead of being divided or distributed. Accordingly, the accumulated earnings tax pursuant to the provisions of section 531 of the Internal Revenue Code is imposed upon you for each of the aforementioned years. Respondent sent a notice of transferee liability to Charles and Emma Turner determining a liability against them as transferees of Turner Enterprises for the deficiencies determined against that corporation for its calendar years 1957, 1958, 1959, and 1960. Respondent concedes that if he is sustained in his determination that the income from the partnership of Park Beverage Company reported by Turner Enterprises for each of the years 1957, 1958, 1959, and 1960 is taxable to Charles and Emma Turner, that no deficiency exists in the tax of Turner Enterprises, Inc., for those years, and there is no liability of Charles and Emma Turner as transferee of the assets of Turner Enterprises, *256 Inc. Ultimate Facts Enterprises was a bona fide partner in 1957 and 1959 Park and the partnership income allocable to Enterprises' partnership interest is taxable to it. Enterprises was availed of for the purpose of avoiding income tax with respect to its shareholder by allowing its earnings and profits to be accumulated instead of being distributed. Opinion The first issue presented is whether Turner is taxable on the distributive portion of the income of 1957 and 1959 Park reported by Enterprises. This requires a determination of whether Enterprises is to be treated for Federal income tax purposes as a partner in 1957 and 1959 Park. Petitioners argue that the dissolution of 1950 Park in which Turner had a majority interest and the formation of 1957 Park, the successor to 1950 Park, in which Turner held a 10 percent interest and his solely owned corporation, Enterprises, held a 32 percent interest, constituted a transfer by Turner of a 32 percent interest in the partnership business to Enterprises and a contribution by Enterprises of this interest to the new partnership, 1957 Park. Respondent contends that Enterprises contributed neither capital nor services to the *257 partnership and, consequently, cannot be considered a partner in 1957 Park. Respondent asserts that in substance Turner merely assigned to Enterprises a right to receive 32 percent of the partnership income and that within the rationale of Helvering v. Horst, 311 U.S. 112 (1940), Turner cannot avoid taxation by means of this type of an assignment. For a person to be recognized as a partner for Federal income tax purposes, he must make a contribution to the partnership either of valuable services or of capital. Commissioner v. Culbertson, 337 U.S. 733 (1949). The parties agree that Enterprises did not contribute any services to the partnership. Therefore, if Enterprises is to be considered a partner in 1957 Park it must be shown that it made a contribution of capital. The parties have stipulated that capital was a material income-producing factor to the partnership. During the period February through May 3, 1957, 1950 Park was dissolved, Enterprises was incorporated with Turner as sole shareholder, and 1957 Park was organized. In 1950 Park, Turner had a 62.07 percent interest. However, 1950 Park had paid 42 percent of its net operating profits to Security *258 Products and 1957 Park did not make this payment so that a 42 percent interest in 1957 Park represents at least a value equal to Turner's interest in 1950 Park. [1] In 1957 Park, Enterprises was made a 32 percent partner at Turner's instigation and Enterprises' interest was considered by the partners to represent a portion of the interest to which Turner was entitled, even though there was no formal instrument transferring the interest. Section 704(e) [2] dealing with family partnerships specifically provides that a person shall be recognized as a partner if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift. This section is a legislative recognition with respect to family partnerships that the owner of a capital interest in a business is the recipient of the income generated from the property he owns. Certainly a corporation which owns a capital interest in a business, even though acquired from its sole stockholder, is the owner of the *259 income derived from that capital interest. Turner, by creating Enterprises as a 32 percent partner in 1957 Park while his interest in Park was reduced to 10 percent with the other continuing partners obtaining relatively the same or larger interests in 1957 Park than they had in 1950 Park, in effect, transferred a capital interest in the partnership to Enterprises. Cf. William H. Gross, 7 T.C. 837 (1946). Turner acting as general partner transferred the operating assets of 1950 Park to 1957 Park by a general assignment. Those assets as of June 30, 1957, had an original cost or other basis to 1957 Park of approximately $644,000. Other valuable assets acquired by 1957 Park were Park's trade name and the favorable distributorship franchise agreement in existence between 1950 Park and the Lucky Lager Brewing Company. By being constituted a 32 percent partner in Park, Enterprises acquired a 32 percent interest in these assets of the business. The 1957 partnership agreement, made pursuant to the Uniform Limited Partnership Act of the State of California, constituted Enterprises a partner *260 in 1957 Park. By the terms of this agreement Enterprises was given th right to vote on the issue both of expelling a partner and of terminating the business, and also Enterprises, as well as any other partner, on termination of the partnership could choose to continue the partnership business with the right to retain and use the partnership name and assets in the conduct thereof. As part of the transaction whereby it acquired a capital interest in the partnership, Enterprises undertook to contribute $8,000 of its own to the capital of 1957 Park. This obligation to contribute $8,000 to the capital of the partnership was binding on Enterprises from the time 1957 Park was formed, Section 15517 California Corporation Code, and Enterprises made its $8,000 contribution in September 1957 by returning to the partnership $8,000 of earnings which represented a portion of Enterprises' share of partnership earnings arising after March 1, 1957. Through the years in issue Enterprises built up its investment in the partnership by leaving part of its share of earnings in the business. See Sanford H. Hartman, 43 T.C. 105 (1964). We hold Enterprises acquired and held through the years *261 in issue a capital interest in the Park partnership. Respondent argues that a taxpayer cannot make his wholly owned corporation a partner with himself in a business enterprise because any transfer of a partnership interest to his wholly owned corporation does not constitute a completed transfer within the rationale of Helvering v. Clifford, 309 U.S. 331 (1940), and Commissioner v. Sunnen, 333 U.S. 591 (1948), but rather is a transfer "from one pocket to another." No contention is made that under California law a corporation, if authorized by its Articles of Incorporation, cannot be a partner in a partnership and, in fact, California law is to the contrary. Universal Pictures Corp. v. Roy Davidge F. Laboratory, 45 P. 2d 1028 (1935); California Corporation Code, Sections 15002 and 15006. Respondent's point is that the control Turner had over Enterprises by virtue of his 100 percent stock ownership is analogous to the control retained by the purported donor in the Clifford and Sunnen cases and that as a result there was no completed transfer of a partnership interest to Enterprises. Respondent's contention is contrary to the established doctrine *262 of the separateness for tax purposes of a corporation and its sole shareholder. National Carbide Corporation v. Commissioner, 336 U.S. 422 (1949), and Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943). Income from property is taxable to the owner of the property even though the owner is a corporation which received the property by transfer from its sole stockholder. Enterprises owned a 32 percent interest in the partnership and, therefore, the income from this interest is taxable to Enterprises. The fact that Turner was the sole shareholder of Enterprises does not make Enterprises any the less the owner of the 32 percent interest in 1957 Park. Turner's control over Enterprises' property is the same as that possessed by any sole shareholder over his corporation and thus, within the rationale of National Carbide Corporation v. Commissioner, supra, and Moline Properties, Inc. v. Commissioner, supra, such control should not result in the income from the corporate property being taxed to the sole shareholder, but rather such income should be taxed to the corporation. The cases cited by respondent are distinguishable. In *263 Commissioner v. Sunnen, supra, the taxpayer who owned various patents assigned to his wife his interest in various license contracts involving those patents which had been entered into between that taxpayer and a corporation in which he held a controlling stock interest. These license contracts were nonexclusive, did not specify a minimum amount of royalties to be paid thereunder, and could be cancelled by either of the contracting parties, without liability. The Court held that the royalties paid to the wife pursuant to the assignments were taxable to the husband. The rationale of the Court was that the taxpayer had retained substantial control over the license contracts after he had assigned them to his wife. The control the taxpayer retained resulted in part from his control over the corporation, in that he could affect royalty income by having his corporation limit production of the royalty producing products, or by having the corporation cancel the royalty contract and in part from the fact that the taxpayer could also affect the amount of the royalty income received by his wife by licensing competitors to manufacture and sell the same device. In Commissioner v. Sunnen, supra, *264 the grantor taxpayer retained substantial control over the property given his wife, and it was this control which made the income taxable to the donor. The only control Turner had over the amount of partnership income received by Enterprises was that by his effectiveness as general partner and manager of the beer distributing business he could affect the overall earnings of the partnership. This control differs from that in Commissioner v. Sunnen, supra, because here Turner's control would affect, for better or worse, the partnership income not only of Enterprises but of all the partners, including Turner, himself, whereas in Commissioner v. Sunnen, supra, the taxpayer could recover for himself the royalties he could divert away from his wife. Helvering v. Clifford, supra, involved a taxpayer who made his wife income beneficiary of a 5-year trust with the taxpayer retaining full management powers over the trust corpus. The Court held that the combination of the wife being the beneficiary and the powers over the corpus being retained by the husband resulted in the husband taxpayer being treated for tax purposes as the owner of the trust property *265 and thus taxable on the trust income. In the present case, Turner's only substantial control over the partnership interest owned by Enterprises was the indirect control that adheres to any shareholder over the assets owned by his corporation, but this indirect control does not suffice to make the corporate income taxable to the shareholder, National Carbide Corporation v. Commissioner, supra, and Moline Properties, Inc. v. Commissioner, supra. We hold that Enterprises was a partner in 1957 and 1959 Park and that respondent erred in including in Turner's income for the years 1957 through 1960, Enterprises' distributive share of the partnership income and for the year 1960 the gain on the sale of Enterprises' partnership interest. Respondent determined that Enterprises was subject to the tax imposed by section 531 on the assumption that Enterprises was a partner in 1957 and 1959 Park and was entitled to distribution of 32 percent of the profits of those partnerships from March 1, 1957, as of which date the partnership agreement dated April 3, 1957, became effective throughout the years here in issue. Section 531 imposes in addition to other taxes an *266 accumulated earnings tax on every corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders. [3] Turner testified that one of the reasons he wanted to transfer his interest in Park to a corporation was because he was in an income tax bracket higher than the tax rate applicable to corporations. This reason for having Enterprises become a limited partner in Park, considered in conjunction with the earnings history of Park, the nature of the property or interests acquired by Enterprises with the amounts it withdrew from Park, Enterprises never paying a dividend and being dissolved after it sold its partnership interest, convinces us that Enterprises was availed of for the purpose of avoiding the income tax with respect to its shareholder. *267 While section 533 [4] creates a presumption that the purpose to avoid tax on shareholders exists when earnings and profits of the corporation are permitted to accumulate beyond the reasonable needs of the business and makes the fact that a corporation is a mere holding or investment company prima facie evidence of the purpose to avoid tax on shareholders, "the statutory prohibition may apply irrespective thereof whenever the proscribed purpose appears." Pelton Steel Casting Co., 28 T.C. 153, 173 (1957) and cases there cited, affd. 251 F. 2d 278 (C.A. 7, 1958), certiorari denied 356 U.S. 958. The issue is one of ultimate fact and respondent's determination is presumptively correct. Olin Corporation, 42 B.T.A. 1203 (1940), affd. 128 F. 2d 185 (C.A. 7, 1942). In the instant case we are convinced from the evidence that irrespective of whether Enterprises was formed for the purpose of avoiding the income tax on its shareholder, whether it was a "mere holding or investment company" or whether it accumulated its earnings beyond the reasonable needs of its business, that it was availed of for the purpose of avoiding the income *268 tax with respect to its shareholder. However, since the parties take opposite positions on each of these points, we consider it appropriate to discuss their various contentions. Section 534[5] provides that if respondent sends the taxpayer a notification of his proposed determination regarding accumulated earnings tax and the taxpayer submits a statement of grounds together with facts sufficient to show the basis thereof on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted *269 to accumulate beyond the reasonable needs of business, the burden of proof with respect to this fact shall be upon respondent. *270 In the instant case, Enterprises did submit a statement purporting to be in accordance with the requirements of section 534, but on brief has stated specifically that it does not contend that the statement it filed is sufficient to shift the burden of proof to respondent. Statements under section 534 have been held not to shift the burden to respondent unless the statements are adequate and state clearly and definitely the grounds on which the taxpayer relies. See J. Gordon Turnbull, Inc., 41 T.C. 358, 371 (1964), on appeal (C.A. 5, Aug. 16, 1964). Respondent in the instant case takes the position that Enterprises was both formed and availed of for the purpose of avoiding the income tax with respect to its sole shareholder, Turner, and that the evidence shows that Enterprises was a mere holding or investment company as well as that its earnings and profits were permitted to accumulate beyond the reasonable needs of its business. Petitioners contend that respondent has not properly placed in issue whether Enterprises was formed for the purpose of avoiding the income tax with respect to its shareholder. [6] Since the notice of deficiency did not state that Enterprises *271 was formed for the purpose of avoiding the income tax with respect to its shareholder, respondent's pleadings must be sufficient to place in issue this question if we are to consider it. We agree with petitioners that an incorrect reference to a determination that Enterprises was "formed" for the proscribed purpose is not a clear raising in the pleadings of an affirmative issue. Although none of the investments by Enterprises was of a type that required an active day-to-day operation by officers or employees of that corporation and its chief income-producing asset was a passive investment as a limited *272 partner in Park, the operation of the Remington Rand Business Machine, the breeding of a few mares which produced several colts, and the participation in El Con as a general partner in the rental of apartments are sufficiently in the nature of business activities that we conclude that Enterprises was not a mere "holding or investment company" within the meaning of section 533 under our decision in Nemours Corporation, 38 T.C. 585, 601 (1962) affirmed per curiam 325 F. 2d 559 (C.A. 3, 1963). The evidence shows that earnings and profits of Enterprises were permitted to accumulate beyond the reasonable needs of its business. Shortly after its incorporation Enterprises made its first purchase of property. The property was unimproved land. The property remained unimproved until after the liquidation of Enterprises. The record is devoid of any details of efforts to obtain tenants. [7] The other real properties purchased by Enterprises consisting of a lot in Los Angeles County and three lots purchased at one time and six at another time in Burbank, California were likewise never improved and Turner's explanation of the reason for failure to improve these properties *273 is equally as vague. [8] It is this vague and inconclusive testimony of Turner's on which petitioners rely to establish that Enterprises had business plans for the various properties. "If such a vague plan were sufficient to avoid the corporate surtax, any individual could organize a one-man corporation, * * * and assert that * * * business needs required the accumulation of corporate earnings." I. A. Dress Co., Inc. v. Commissioner, 273 F. 2d 543 (C.A. 2, 1960), affirming 32 T.C. 93. *274 While Enterprises' investment in El Con was in the very broadest sense of the word a "business" activity, since generally the rental of property is viewed as a trade or business, as a practical matter this investment was not an active business operation by Enterprises. Under the partnership agreement Hirshal was to act as general contractor for the improvements to be made and Rosemont was to maintain the books and records and to supervise the preparation and design of all improvements and to execute all instruments on behalf of the partnership. All that Enterprises was to do was to stand available to render such assistance as might be necessary. Enterprises had no paid employees except for a short while when it was operating the Remington Rand Business Machine for Park, and its activities were handled either by Turner or Rosemont, neither of whom was paid a regular salary by Enterprises, although it does appear that certain payments into El Con on Rosemont's behalf might have in effect constituted some compensation to him. Rosemont at all times here in issue was the general manager of Park which was a full-time position. Petitioners do not contend that the $5,000 investment in *275 Tronus Corporation and the $9,900 used to purchase an interest in the Burbank Tropicana Apartment were other than passive investments. The investment made by Enterprises in breeding horses likewise required a minimum of active participation on behalf of the corporation. The horses were kept at Ryan's ranch and the record indicates that all that Enterprises did was to pay the necessary fees and expenses for their care at that ranch. These payments were relatively small. The only real contention petitioners make as justifying Enterprises' accumulation of its earnings and profits other than vague suggestions with respect to plans for building on various real properties, is an intention to purchase a ranch. Turner himself had been in the business of racing horses and to some extent, breeding horses, and the indication from the evidence is that the ranches that were looked at were considered principally from the standpoint of their suitability for Turner's personal use. [9] The evidence also indicates that Turner was looking for a ranch which would constitute a good investment from the prospect of increase in value of land. [10]
*276 The main function of Enterprises during the years here involved was being a 32 perment partner in 1957 and 1959 Park, a beer distributorship. Cf. Edward G. Swartz, Inc., 33 B.T.A. 355 (1935). Petitioners do not contend that Enterprises needed to accumulate its earnings and profits to maintain its interest in 1957 or 1959 Park. Since Enterprises was a limited partner no reason appears why it would need to accumulate any earnings or profits to protect its investment in Park. The evidence shows that Enterprises' other investments were made primarily to use the income it received from Park instead of distributing it in dividends. Cf. Kerr-Cochran, Inc., 30 T.C. 69 (1958), affd. 253 F. 2d 121 (C.A. 8, 1958); Raymond I. Smith, 33 T.C. 141, affd. 292 F. 2d 470 (C.A. 9, 1961), certiorari denied 368 U.S. 948; and J. M. Perry & Co. v. Commissioner, 120 F. 2d 123 (C.A. 9, 1941), affirming a Memorandum Opinion of this Court. Petitioners rely on the statement in Enterprises' charter of the various initial businesses it is to engage in as supporting their contention for need to accumulate its earnings. *277 The conclusion we draw is that these statements were put in Enterprises' charter to facilitate its carrying its earnings from its interest in the very lucrative beer distributorship over into investments in real estate and breeding horses. These latter undertakings have no connection whatsoever with its interest in the beer distributorship. The evidence shows that Enterprises' activities in breeding horses was primarily in furtherance of Turner's personal interest in race horses. Our finding that Enterprises permitted its earnings and profits to accumulate beyond the reasonable needs of its business is determinative of the purpose to avoid income taxes with respect to its shareholders, unless the taxpayer by a preponderance of the evidence proves to the contrary. There is no evidence in the record to rebut this presumption. An intent to avoid taxes need only be one purpose for the accumulation, it need not be the only or primary purpose. Trico Products Corp., 46 B.T.A. 346 (1942), affd. 137 F. 2d 424 (C.A. 2, 1943) certiorari denied 320 U.S. 799. The creation of Enterprises as holder of a 32 percent interest in 1957 Park and the immediate *278 liquidation of Enterprises upon the sale by Enterprises of its partnership interest suggests that one purpose in creating Enterprises was to save Turner taxes by diverting to Enterprises some of the partnership income Turner otherwise would have received. Turner testified that tax savings was one of his purposes in having Enterprises become a partner in Park. The accumulation of earnings and profits by Enterprises, thereby saving Turner a considerable amount in taxes over what he would have had to pay had the corporate earnings been distributed, suggests that such accumulations were likewise motivated by the tax savings to Turner. Petitioners, without conceding that Enterprises had "any unrelated investments which evidenced an unreasonable accumulation of earnings and profits," urges that should the Court accept respondent's contention and hold that some of the properties acquired for "business operation" changed their status to solely investment properties in 1959 or 1960, the accumulated earnings credit under section 535(c)(1) should allow an amount in addition to the amount of minimum credit allowed in section 535(c)(2) as being retained by Enterprises for the "reasonable" needs *279 of the business.[11] We consider all the real estate interests acquired by Enterprises to be from the date of their acquisition in the nature of passive investments. In view of our conclusion that only very minimal amounts are shown to be needed for the normal operation of any activities of Enterprises which might be considered a business, we hold that the minimum credit as allowed by section 535(c)(2) has not been shown by Enterprises to be insufficient for the reasonable needs of any business in which it was engaged. See Barrow Manufacturing Company v. Commissioner, 294 F. 2d 79 (C.A. 5, 1961), affirming a Memorandum Opinion of this Court. *280 Petitioners contend that in any event Enterprises cannot be held liable for the accumulated earnings tax for the year 1960 because prior to the last day of that year it had adopted a plan of complete liquidation pursuant to section 337. Petitioners' argument is that once a corporate liquidation is underway all distributions to the shareholders are taxable as capital gains and, consequently, Enterprises' failure to distribute its earnings and profits by year end 1960 as opposed to 1961, when such earnings and profits were in fact distributed, cannot be ascribed to an intent to avoid taxes. Section 535(a) provides that the amount of dividends paid by the corporation is to be subtracted from corporate income in computing accumulated taxable income for purposes of determining the accumulated earnings tax, and section 562(b) provides in the case of a corporate liquidation, other than a domestic or foreign personal holding company, that part of such distribution in liquidation which is properly chargeable to earnings and profits accumulated after February 28, 1913, shall be treated as a dividend for purposes of computing the dividends paid deduction. The provisions for a dividends paid *281 credit to the corporation for some portion of the amounts it distributes in liquidation suggests that Congress intended the accumulated earnings tax to apply to a corporation in the process of liquidation. It is true as petitioners contend that all distributions in liquidation will receive capital gains treatment. Nevertheless, the failure of Enterprises to distribute its earnings and profits by year end 1960 enabled its sole shareholder, Turner, to delay reporting gain on such distribution, albeit taxable as a capital gain, until the next year. There is no contention made that Enterprises needed to hold back any of its assets to satisfy creditors or that there was any other factor inhibiting the distribution of Enterprises' earnings and profits by year end 1960. Enterprises' main asset, its interest in the beer distributorship, was sold on October 31, 1960. The record does not show that Enterprises engaged in any business activities thereafter for which it needed to retain any accumulated earnings. See J. Gordon Turnbull, Inc., supra, at page 374. We sustain respondent in his determination that Enterprises is subject to the tax imposed by section 531 in each of the *282 years 1957, 1958, 1959 and 1960 and that Turner was liable for the taxes due by Enterprises as transferee of its assets. Decision will be entered under Rule 50. Footnotes
1. In a Corporation which became 20 percent limited partner in 1957 Park apparently represented the same interest as Security Products.↩
2. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
3. SEC. 531, I.R.C. 1954. imposition of accumulated earnings tax./ In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of - (1) 27 1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38 1/2 percent of the accumulated taxable income in excess of $100,000. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule. - The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. (b) Exceptions. - The accumulated earnings tax imposed by section 531 shall not apply to - (1) a personal holding company (as defined in section 542). (2) a foreign personal holding company (as defined in section 552), or (3) a corporation exempt from tax under subchapter F (section 501 and following).↩
4. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. (b) Holding or Investment Company. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of the purpose to avoid the income tax with respect to shareholders.↩
5. SEC. 534. BURDEN OF PROOF. (a) General Rule. - In any proceeding before the Tax Court involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business, the burden of proof with respect to such allegation shall - (1) if notification has not been sent in accordance with subsection (b), be on the Secretary or his delegate, or (2) If the taxpayer has submitted the statement described in subsection (c), be on the Secretary or his delegate with respect to the grounds set forth in such statement in accordance with the provisions of such subsection. (b) Notification by Secretary. - Before mailing the notice of deficiency referred to in subsection (a), the Secretary or his delegate may send by certified mail or registered mail a notification informing the taxpayer that the proposed notice of deficiency includes an amount with respect to the accumulated earnings tax imposed by section 531. In the case of a notice of deficiency to which subsection (e)(2) applies and which is mailed on or before the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day. (c) Statement by Taxpayer. - Within such time (but not less than 30 days) after the mailing of the notification described in subsection (b) as the Secretary or his delegate may prescribe by regulations, the taxpayer may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which the taxpayer relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.↩
6. The notice of deficiency stated only that Enterprises was availed of for the proscribed purpose. The only mention in the pleadings of Enterprises being formed for the proscribed purpose is in respondent's answer wherein it is stated: "FURTHER ANSWERING the petition, and in support of the determination that the petitioner was formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders by the medium of permitting earnings and profits to accumulate instead of distributing such income to its shareholders, the respondent alleges: * * *"↩
7. Turner, in response to questions about this property, testified: Well, we were figuring on building to suit tenants out there and on the back part of it, it was a railroad track running along the back part, and on the front part Arrow Highway was a pretty nice highway; and we had taken it up with the couple different real estate guys in Rialto to advertise it for lease, for people to build or lease; but we never did get any response, and I don't know what went on there. That property over there just seemed to be standing still, is still there and we still own it. ↩
8. Turner's testimony as to the lot in Los Angeles was, "Well, they were figuring on building two houses up there, of course." With respect to three of the lots in Burbank, Turner testified as follows: Q. What was the plan of Enterprise with respect to this property? A. Building another apartment. Just something in the line of this apartment we had. Only with no single apartments and two bedrooms and larger rooms. Q. Did you ever have architectural plans prepared? A. No. I got ahold of a, after that I ran into a contractor. Some guys, different friends of mine, told me about, by the name of Mr. Nester, and we went - I took him and we went by this apartment that we had, and then we went over to the property on Sixth and Tujunga or Fifth and Tujunga and looked it over, and I told him about what I wanted; and I told him at this time that we were looking for a ranch and if I got a ranch, why, we were going to buy the ranch first and then, later on, we would build this property up there. And he said, "Well, when you get ready", he says, "I got a very good architect, and he would be glad to build it." With respect to the other lots in Burbank, Turner's explanation of why no improvements were ever made was: Well, that property is right, practically in the downtown of Burbank, and I figured that it would be a very good plece of property to turn around and put some offices, put maybe one or two stories up with an office building, and down below for a drug store and other little stores in there, and then save about two lots of it for parking. Q. Was this actually ever done? A. This was never done, but it was still - Q. Did you have any architectural plans prepared? A. No, sir. Q. Did you discuss it with a contractor? A. Yes, sir. Q. What contractor? A. The same one.↩
9. The witness, Douglas Pregent, testified; Q. * * * Did you specifically understand on those behalf you were looking for a ranch? A. Oh, yes. Q. In whose behalf were you looking? A. I was looking for Mr. Turner's behalf. Q. Mr. Turner? Individually? A. Yes. Q. And not a corporation. You thought it was Mr. Turner individually? A. Well, I wasn't sure about that. I didn't know. I wasn't taken into that. Rosemont's letter to Robinson relating to the purchase of a ranch was signed by him individually, not by him as an officer of Enterprises and made no specific reference to Enterprises. At one point in his testimony Turner did state that he was looking for a ranch on behalf of Enterprises but his other testimony does not distinguish between a place for his own horses and those of Enterprises, so even his testimony as a whole supports the conclusion that he personally was to use the ranch. ↩
10. Rosemont in his letter offering to purchase a ranch stated: Mr. Turner and I have spent considerable time trying to determine whether there was any possible way of getting together with you on the purchase of your ranch. We genuinely felt that our initial offer set a fair price on the value of your ranch to the operation we contemplate. While it is true that the land value may increase in subsequent years because of its possible use as industrial property, if it does so the buildings and other improvements will lose their value since they have no industrial application. The problem is that so much of your own investment is tied up in the improvements which will only have value as long as the property is used as a horse ranch. We both feel that this presents something of a dilemma and I am explaining it at this length so you will understand why we are being so careful in our calculation of the investment value of your property as well as its value to a breeding operation. On that basis, even if the land doubled in value because of its use for industrial purposes, it would still barely compensate for the loss in value of the improvements which, after all, have no industrial application. On the other side of the balance, of course, is the fact that you have a fine location and an excellent set-up for the operation of the breeding ranch which is our main concern at the present time.↩
11. Sec. 535(c) Accumulated Earnings Credit. - (1) General rule. - For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b)(6). For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561) for such year. (2) Minimum credit. - The credit allowable under paragraph (1) shall in no case be less than the amount by which $100,000 exceeds the accumulated earnings and profits of the corporation at the close of the preceding taxable year.↩