Walter F. Maxwell and Donna M. Maxwell v. Commissioner. W. F. Maxwell, Inc. v. Commissioner.
Maxwell v. Commissioner
Docket Nos. 2259-68 and 2265-68.
United States Tax Court
T.C. Memo 1970-293; 1970 Tax Ct. Memo LEXIS 65; 29 T.C.M. (CCH) 1356; T.C.M. (RIA) 70293; October 20, 1970. Filed *65 James O. Hewitt and Thomas F. Greaves, U.S. Nat'l Bank Bldg., San Diego, Calif., for the petitioners. J. Earl Gardner, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in the income taxes of petitioners Walter F. and Donna M. Maxwell for the calendar years 1964 and 1965 in the amounts of $9,826 and $8,469, respectively, and deficiencies in the income taxes of W. F. Maxwell, Inc., for its fiscal years ended January 31, 1965 and January 31, 1966, in the amounts of $237,602.87 and $187,465.52, respectively. Certain of the issues raised by the pleadings have been conceded by respondent leaving for our decision the question of whether a purported partnership consisting of one of the individual petitioners and the corporate petitioner is properly recognizable for Federal income tax purposes or whether the income of the partnership was really income of the corporate petitioner, a portion of which was distributed to the individual petitioners as dividends in the years in issue. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner W. F. Maxwell, Inc. (hereinafter *66 referred to as Maxwell, Inc.), was incorporated under the laws of the State of California in February 1954 and has been and still is an active corporation. It maintained its principal offices at the time the petition in this case was filed at 10641 Mulberry Street, Fontana, California. [1] Using an accrual method of accounting Maxwell, Inc., maintained its books and records and filed its Federal income tax returns on the 1357 basis of a fiscal year ending January 31. For the taxable years ended January 31, 1965 and 1966 its returns were filed with the district director of internal revenue in Los Angeles, California. The individual petitioners, husband and wife, resided at the time their petition in this case was filed at West Covina, California. They filed joint Federal income tax returns for the calendar years 1964 and 1965 with the district director of internal revenue at Los Angeles, California, using the cash method of accounting. W. F. Maxwell Company (hereinafter referred to as Maxwell Company) filed partnership returns of income *67 with the district director of internal revenue at Los Angeles, California, for the fiscal years ending January 31, 1956 through January 31, 1966, using the completed contracts method of accounting. At all times material to this case the office of Maxwell Company was located at 10641 Mulberry Street, Fontana, California. Walter F. Maxwell (hereinafter referred to as petitioner) is a general engineering contractor qualified and licensed to do business in the States of California and Arizona. He was born in New York and acquired his engineering education at night school during the years 1930 to 1940, while employed by the New York State Highway Department. From 1941 through 1946, he was an engineer with the United States Army, first as a civilian with the Corps of Engineers and thereafter as a commissioned officer. In 1946 petitioner resigned from active duty and took a position as project manager with Daley Brothers Construction Co., a general engineering contractor with headquarters in San Francisco, California. He left Daley Brothers in 1947 to form a partnership with C. K. Moseman and Charles MacCloskey. Operating under the firm name of Chas. MacCloskey Co., the partnership specialized *68 in state highway and state bridge construction work in California, building a number of bridges under petitioner's supervision. In 1952 Maxwell withdrew from the partnership and continued to construct bridges for the State and its political subdivisions as a sole proprietor. During the years 1952 and 1953, operating as a sole proprietor, petitioner could only bid on small state bridge projects because of his limited capital. In order for a contractor to bid on construction projects for the state or its political subdivisions, California requires such contractor to prequalify on the basis of experience and financial ability, as reflected in financial reports filed annually with the Department of Public Works. Before a construction contractor may bid on such government construction projects, he must file with the Department of Public Works a "Contractor's Statement of Experience and Financial Condition" in accordance with the applicable provisions of the California Code. On the basis of the statement, a contractor is entitled to bid on certain classes of work up to a maximum dollar limitation which is the lesser of 10 times the contractor's working capital or four times his net worth *69 less the value of the incomplete work on all going contracts. In addition to prequalification, the state requires each construction contractor to furnish a bidder's bond equal to at least 10 percent of the total of the bid submitted to the state before the bid is considered. The successful bidder must also furnish a performance bond equal to 50 percent of the contract awarded as well as a labor and material bond equal to 50 percent of the contract price. Operating as a sole proprietor petitioner was in competition with large established companies whose size and wealth created attractive opportunities for the young employees. Bridge construction is a competitive field, particularly with regard to employment, because of the scarcity of good bridge building personnel. In order to attract and keep qualified employees petitioner decided to form a corporation and give certain key employees a proprietary interest in the company. Therefore, petitioner formed Maxwell, Inc., by contributing $50,000 in cash in return for 5,000 shares of stock. [2] Petitioner on February 22, 1954, offered to sell to Maxwell, Inc., the assets which he used in his bridge building business at a sales price of *70 $145,717 evidenced by a promissory note at 5 percent. At petitioner's suggestion, the equipment was later appraised at a value of $116,694 and the sales price reduced to this amount. The note given to petitioner by Maxwell, Inc., was for the reduced amount. Stock in the corporation was issued to its employees in the following amounts: 1358 Employee
Number
of shares
Walter F. Maxwell (held by W. F. Maxwell and Donna M. Maxwell
5,000
in equal amounts)
Halger B. Raun
600
Marcus N. Latham
200
William A. Brady
200
Truman D. Hart
200
Victor E. Franks
100
Total
6,300 The stockholders other than petitioner subscribed for their stock at $10 a share, cash, under a stock subscription agreement dated February 20, 1954. Pursuant to the subscription agreement the stock was actually issued to these employees on October 25, 1954. On February 20, 1954, petitioner offered to assign to the corporation three incompleted construction *71 contracts he had entered into with the state as a sole proprietor and on February 25, 1954, the corporation's board of directors accepted this offer. In 1963 a second stock offering was made at $37 per share to the following employees who acquired at this price the amounts of stock set forth below in December 1963: Employee
Number of shares
Ralph A. Brady
300
Halger B. Raun
100
William M. Mlagenovich
200
Victor E. Franks
200
Total
800 At the time of the initial offering to employees, Latham, Raun, and Brady, respectively, had 16, 21, and 21 years' experience in construction. At the meeting of the board of directors of Maxwell, Inc., on February 25, 1954, petitioner was elected president and general manager of the corporation and has continuously thereafter served in that capacity. Petitioner desired to have his employees have a proprietary interest in his business without being exposed to unlimited personal liability and for this reason on the advice of his attorney formed the corporation and offered the corporate stock to such employees instead of offering a partnership interest in his business. At the time the corporation was formed petitioner knew *72 that he would have to submit his own personal assets to the prequalification procedures of the state of California in order to make it possible for the corporation to bid on substantial projects. Without petitioner's personal assets Maxwell, Inc., could have qualified only to the extent of 4 times its net worth or an initial dollar limitation of $200,000. In order to file the largest possible prequalification statement petitioner and Maxwell, Inc., undertook to form a partnership under the name "W. F. Maxwell Company," entering into a partnership agreement for the purpose of engaging primarily in state highway construction work. Under the agreement petitioner made his personal assets available for prequalification and financing purposes of the partnership and in return was to receive 15 percent of the profits of the partnership. The agreement provided in this respect as follows: 6. The partners shall make the following contributions to the partnership: (a) W. F. Maxwell, Inc. will contribute the use of its total assets for prequalification purposes, and will furnish management and general overhead. It also will advance funds as necessary for all direct job costs, which funds *73 are to be reimbursed by the partnership from its receipts of progress and final payments. (b) W. F. Maxwell, will contribute the use of his personal assets for prequalification purposes and lend financial assistance as necessary to finance the execution of public works contracts awarded to the partnership, also his prequalification rating, and use of contractor's licenses necessary for operation of the partnership business. 7. The net profit of the partnership shall be divided and the net losses shall be borne as follows: (a) W. F. Maxwell, Inc. shall receive eighty-five per cent (85%) of the gross profits and bear the same percentage of the losses of the partnership business. (b) W. F. Maxwell shall receive fifteen per cent (15%) of the gross profits and bear the same percentage of the losses of the partnership business. (c) The gross profit for the purpose of the above paragraphs is defined as total billing less direct job costs. It is not uncommon in the highway and highway bridge construction field for one entity to make its net worth available to another for prequalification and bonding purposes and to receive a portion of the profits in return for so doing. Maxwell *74 Company has in fact been involved in similar arrangements with outside contracting firms utilizing the net worths of such firms for prequalification purposes and to obtain the necessary bonds and in return paying to such firms a specified percentage of the 1359 profit received from the contract. Depending on the extent of the lending entity's involvement and participation in the contract, the profit received by such entity might be as high as between 25 and 50 percent. Commercial checking accounts were established and maintained by Maxwell, Inc., and Maxwell Company at the main branch of the Bank of America in Los Angeles, California. In addition Maxwell Company established an account with the Valley Bank of Nevada. All of these accounts have been continually and actively used with both deposits and withdrawals being made from such accounts. From the time of its formation through the fiscal year ended January 31, 1966, Maxwell Company specialized and engaged in the business of building bridges on state and interstate highway projects. Maxwell Company was the only entity in the Maxwell group prequalified to bid on state jobs in California and the only such entity licensed to *75 do business in Nevada. During the period from its formation through its fiscal year 1966, each and every contract awarded on the basis of bids submitted by Maxwell Company was awarded to that company and each such contract was executed on its behalf and in its name. All progress payments and final payments made under the contracts were paid to Maxwell Company and deposited in Maxwell Company's commercial checking accounts. Most of such contracts were lump sum contracts or fixed unit price contracts as opposed to cost plus fixed fee contracts. From 1954 through the fiscal year ended January 31, 1966, the corporation, Maxwell, Inc., was the managing partner of the partnership and maintained its books and records. The corporation furnished and paid for all the management labor costs and all of the production labor costs with its checks. In addition the corporation used its checks to pay for all materials, equipment rentals, and amounts due subcontractors, charging the direct job costs as debits on the ledger card of the company and credits on the ledger cards of the corporation's accounts payable. At the end of the month the intercompany account for the partnership labeled "advances *76 to W. F. Maxwell, Inc.," and the intercompany account for the corporation labeled "advances from W. F. Maxwell Company" are balanced by a single journal entry. Maxwell, Inc., initially incurred all payroll expenses, using its own employees as well as subcontractors for the actual construction work. Maxwell Company entered into agreements with subcontractors and purchased in its own name materials and services from vendors, but Maxwell, Inc., made all payments to such subcontractors and vendors on behalf of Maxwell Company, receiving from Maxwell Company advances as Maxwell Company received payments from the state. As Maxwell, Inc., made payments through its checking accounts to the subcontractors and vendors it would by bookkeeping entry offset those payments against the advances received from Maxwell Company. The books of Maxwell, Inc., and Maxwell Company were kept in the same binders by the same individuals with the accounts being intermingled in order to facilitate the recording of entries. Appropriate intercompany accounts were maintained to reflect the transfers between the entities. While the bookkeeping system was thus intermingled it was possible at any time for a CPA to *77 prepare a competent financial statement of either entity after making normal adjustment entries. The partnership had no employees and forms 940 (Employers' Annual Federal Unemployment Tax Return) and 941 (Employers' Quarterly Federal Tax Return) were filed only by the corporation. From 1954 through January 31, 1966, Maxwell Company bid on and was awarded the following bridge contracts: Jobs bid
Jobs awarded
Year ended
Number of
Total bid
Partner
W. F.
Number
January 31
bids
amount [1]
Maxwell Co.
awarded
amount
1955
44
30,009,944
10,901,000
19,108,944
5
1956
14
9,174,600
828,710
8,345,890
2
1957
15
21,682,393
11,116,924
10,565,469
2
1958
18
23,944,170
14,082,137
9,862,033
6
1959
37
53,088,604
23,477,934
29,640,670
4
1960
22
27,624,154
14,785,452
12,838,702
5
1961
13
25,415,965
12,354,221
13,061,744
3
1962
21
72,842,519
45,475,743
27,366,776
3
1963
14
44,436,969
30,109,478
14,327,491
2
1964
22
69,375,719
48,080,180
21,295,539
7
1965
15
46,543,599
29,709,408
16,834,191
5
1966
32
99,904,921
62,057,242
37,847,679
7
Jobs bid
Year ended
Total
Partner
W.F.
January 31
amount
amount [1]
Maxwell
Co. amount
1955
1,892,889
513,773
1,379,116
1956
2,142,158
343,263
1,798,895
1957
1,704,746
1,704,746
1958
5,887,222
2,920,490
2,966,732
1959
3,152,183
1,025,340
2,126.843
1960
5,992,997
3,662,003
2,330,994
1961
11,268,857
5,680,982
5,587,875
1962
21,589,548
11,713,926
9,875,622
1963
9,967,220
4,479,571
5,487,649
1964
17,719,424
11,532,898
6,186,526
1965
21,451,994
14,756,068
6,695,926
1966
19,071,751
10,351,857
8,719,894
*78 Petitioner was employed by W. F. Maxwell, Inc., during the years ending January 31, 1955, through January 31, 1966, at a salary ranging from $24,000 to $30,000 and in the year ending January 31, 1959, through January 31, 1966, received additional compensation in the form of contributions to a profit-sharing plan of W. F. Maxwell, Inc., of amounts ranging from $3,500 to $4,400. From February 20, 1954, throughout the years here involved, Maxwell Company periodically filed prequalification statements with the California Department of Public Works. The following schedule shows the respective fair market value net worths of petitioner, Maxwell, Inc., and Maxwell Company as set forth in those statements: Fair market
Maximum
value net worth
prequalification rating
Date of
Petitioners
Maxwell,
Maxwell
Maxwell,
Maxwell
prequalification
Inc.
Company
Inc.
Company
statement
2/20/54
$ 400,064
$ 50,000
$ 450,064
$ 200,000
$ 1,800,000
9/30/54
287,327
190,602
477,929
765,000
1,910,000
12/10/55
287,921
348,806
636,727
1 ,395,000
2,545,000
1/31/57
448,412
407,472
855,884
1,630,000
3,425,000
4/15/58
508,822
588,025
1,096,847
2,350 ,000
4,390,000
4/15/59
501,921
701,686
1,203,607
2,800,000
4,815.000
4/15/60
577,350
836,519
1,413,869
3,345,0 00
5,655,000
4/20/61
674,589
992,620
1,667,209
3,970,000
6,670,000
7/20/62
828,701
1,600,767
2,429,468
6,403,0 00
9,720,000
8/15/63
1,019,018
2,354,453
3,373,471
9,417,000
13,495,000
8/15/64
1,134,157
2,449,407
3,583,564
9,800,000
14,350,000
8/15/65
1,142,737
2,575,910
3,718,647
10,300,000
14,875,000
*79 The listing of petitioner's assets in the prequalification statements did not in and of itself carry any risk of loss of those assets. However, petitioner also during this period signed notes for funds for use of Maxwell Company and assumed liability on the bonds Maxwell Company was required to furnish the State in the event of such a default by Maxwell Company as would cause the State to seek indemnification from the bonding company. From 1962 to 1966 the net income of the partnership was divided in the following percentages between petitioner and Maxwell, Inc.: Petitioner
Maxwell, Inc.
Partnership
Year
Gross income
Costs
Net
Corporationnet
Balance
endedJanuary
ofjobscompleted
income
expenses [1]
31
1962
$ 2,373,025
($ 2,151,074)
$221,951
($159,316)
$ 62,635
1963
5,597,931
( 5,169,636)
428,295
( 139,282)
289,013
1964
4,217,605
( 3,671,725)
545,880
( 224,699)
321,181
1965
11,118,487
( 10,272,515)
845,972
( 104,081)
741,891
1966
7,177,644
( 6,361,701)
815,943
( 281,235)
534,708
$1,949,428
Partnership
Year
Incomefrom
Percentof
Net in-
Percent of
endedJanuary
partner-
ship
Balance
comefrom
Balance
31
partner-ship
1962
$ 33,293
53.2
$ 29,342
46.8
1963
64,244
22.2
224,769
77.8
1964
81,882
25.5
239,299
74.5
1965
126,896
17.1
614,995
82.9
1966
122,391
22.9
412,317
77.1
$428,706
$1,520,722
*80 1361 Neither petitioner nor Maxwell, Inc., withdrew from the partnership their entire distributable income during these years or prior years. From unwithdrawn profits, Maxwell Company had capital as of January 31, 1956, through January 31, 1966, in the following amounts: Year
Amount
1956
$ 111,816.03
1957
194,438.72
1958
432,024.85
1959
718,682.95
1960
364,285.83
1961
352,007.80
1962
210,098.40
1963
443,757.20
1964
538,258.61
1965
1,048,686.00
1966
1,220,241.00
Petitioner, on his Federal income tax returns for the calendar years 1964 and 1965, reported $81,882 and $126,896, respectively, as income from the W. F. Maxwell Company partnership. Maxwell, Inc., on its Federal income tax returns for its fiscal years ended January 31, 1965, and 1966, reported income from the W. F. Maxwell Company partnership in the amounts of $719,076.44 and $693,551.56, respectively. [3]
*81 Respondent in his notice of deficiency to petitioners Walter F. and Donna M. Maxwell determined that for each of the calendar years 1964 and 1965 they received dividends from Maxwell, Inc., in lieu of the partnership income from Maxwell Company which they reported, with the explanation that Maxwell Company is not considered a valid partnership and that all income and expenses of such partnership are allocated to Maxwell, Inc. In his notice of deficiency to W. F. Maxwell, Inc., respondent increased the corporate income as reported in each of its fiscal years ended January 31, 1965 and 1966 by $127,895.84 [4] and $122,391.45, respectively, with the explanation that Maxwell Company is not recognized as a valid partnership and all of its income and expenses are included in the taxable income of Maxwell, inc. Opinion The issue here is factual. Both parties recognize that *82 in order for a valid partnership to exist for income tax purposes, the facts must show that "the partners joined together in good faith to conduct a business, having agreed that the services or capital to be contributed presently by each is of such value to the partnership that the contributor should participate in the distribution of profits, * * *" . Both parties cite and rely on the Culbertson case in support of their position. Petitioner stresses that the ultimate fact to be determined as set forth in that case is whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Respondent stresses some of the underlying facts which are to be considered in arriving at the "true intent" of the parties such as whether the partners have each contributed either valuable services or capital to the alleged partnership. The Culbertson case makes it clear that consideration of all the facts is necessary to determine the "bona fide intent" of the parties even though recognizing that if some of the partners have "contributed neither capital nor services to *83 the partnership during the tax years in question * * * it can hardly be contended that they are in any way responsible for the production of income during those years." Respondent argues that neither petitioner nor Maxwell, Inc., contributed any initial capital to the Maxwell Company partnership and that petitioner contributed no services. Petitioners take the position that the contribution by the individual petitioner of his assets for prequalification purposes and in support of the partnership bonds and borrowing was a contribution of both capital and services and that by the tax years here in issue he had made a capital contribution by allowing his distributive portion of the prior years' income to remain in the partnership. [5] The evidence shows that by 1362 the years here in issue petitioner had made substantial capital contributions to the partnership by not withdrawing the income which he had reported as taxable income since the formation of the partnership. If we consider the income of the partnership which was reported by petitioner to be his income (and respondent does not contend that it was not but rather calls it dividend income), then for the tax years here in issue *84 petitioner did have a substantial capital investment in the partnership. However, in our view, the partnership was valid from its inception on the basis of all the facts present in this case. While respondent has stated that he does not question the validity of Maxwell, Inc., as a corporation, some of his argument appears to do so. In any event, we consider the record sufficient to show that the corporation was organized for a business purpose and operated as a separate entity from petitioner. The individual petitioner originally formed Maxwell, Inc., in order to provide a proprietary interest in his bridge construction business for certain key personnel, which is a valid business purpose. See . Petitioner desired that his employees be given an equity interest in the business with their liability limited to the amount of money contributed by them. The corporate framework within which petitioner chose to operate was of a suitable design *85 to satisfy this valid business purpose. Petitioner found, however, that the corporate structure was too limited in capital to continue the bridge building business on a scale comparable to that enjoyed by petitioner as a sole proprietor. The requirement of the State of California for a contractor's prequalification made it necessary for petitioner to somehow increase the capital and bidding capacity of the bidding entity. It was reasonable for petitioner not to place all of his personal assets within the corporate framework. Also, such a major contribution by petitioner would have reduced the equity retained by the employees significantly. Therefore, in order to boost the bidding capacity of the entity dealing with the State, petitioner and the newly formed corporation entered into an agreement whereby petitioner would advance his assets for prequalification purposes. Such agreements on a single bid basis are common within the industry. It is clear that petitioner and the corporate petitioner had a valid business reason for entering into the agreement and that it was their intention that petitioner's personal assets would be utilized for prequalification purposes so long as was necessary *86 for the needs of the business and that those assets would be available in support of the bonds necessary to perform construction work in California. While the availability of petitioner's assets for prequalification purposes may not be considered strictly capital or services, it provided a necessary requirement within the context of the business and was therefore in the nature of a business asset. When petitioner in effect became surety on the necessary bonds, he made the equivalent of a cash contribution. The availability of his assets was the sine qua non in dealing with the State Department of Public Works. We, therefore, find that petitioner's contribution was necessary to the partnership business, and, in light of the practice of the industry, the contribution was made by petitioner at a reasonable return. The definition of partnership in the Internal Revenue Code is broad enough to encompass the arrangement between petitioner and Maxwell, Inc. Respondent argues that many stockholders use their personal assets to finance their corporations and concludes from this argument that petitioner should have been willing to finance the operations of Maxwell, Inc., as a contractor without *87 any return for so doing. Even had petitioner owned all the stock of Maxwell, Inc., in the years here in issue, we would not be impressed by this argument. However, the facts show that during the years here in issue petitioner owned only 70 percent of the Maxwell, Inc., stock. Certainly petitioner could not be expected to finance the operation for the 30 percent profit of others at no charge. In fact, under our holding that petitioner contributed his assets at a reasonable rate of return for the use of a business, the operations of which were conducted by a corporation created initially for a valid business purpose, even were we to find that the partnership was not recognizable for income tax purposes, the result sought by respondent would not be obtained. Respondent attributes the total income of the partnership to the corporate entity. Because of our finding as to the business necessity for the use of petitioner's assets in the construction business and the reasonable rate of return received by petitioner for making his assets available to the needs 1363 of the construction business, an amount equal to his distributive share of the partnership income would not be unreasonable *88 compensation by the corporation to him for this function and therefore would be a properly deductible business expense of the corporation. Decisions will be entered for petitioners. Footnotes
1. There is no question raised in this case as to the validity of the corporation as a viable tax entity for Federal income tax purposes.↩
2. Petitioner originally took a note for this $50,000, the note to be later satisfied by issuance of stock. The stock was actually issued to petitioner on June 21, 1954, after the issuance was approved by the State Security Commission.↩
1. W. F. Maxwell Company often bid on jobs as a joint venture with road contractors to undertake the road and bridge construction as a single bid. It also undertook other joint venture projects. The partner referred to in these columns designates the other participants in all such joint ventures where the bid or contract was for work to be divided.↩
1. Expenses net of other income↩
3. These amounts consist of the partnership net income distributable to the corporation plus the corporation expenses as follows: Fiscal year ended January 31, 1965 - $614,995 (partnership net income distributable to corporation) plus $104,081 (corporate expenses) equals $719,076. Fiscal year ended January 31, 1966 - $412,317 (partnership net income distributable to corporation) plus $281,235 (corporate expenses) equals $693,552.↩
4. At the trial respondent conceded that this amount should be reduced to $126,896, the amount of the partnership income which was shown on the partnership income tax return for its fiscal year ended January 31, 1965, as distributable to Walter F. Maxwell.↩
5. Petitioners apparently do not contest respondent's contention that the services rendered by the individual petitioner to the partnership were as an officer of the corporate petitioner.↩