George M. and Jean H. JONES, Donald E. and Carol J. McGuire, Charles H. and Julia I. Wilson, Shields O. and Harriette L. Livingston, and Robert G. and Francoise B. Long, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 79–1420.

United States Court of Appeals, Fifth Circuit.

March 27, 1981.

Rehearing and Rehearing En Banc Denied May 19, 1981.

H. David Herndon, George Garrison Potts, Claude R. Wilson, Jr., Dallas, Tex., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Wash., D. C., Gilbert E. Andrews, Acting Chief, Appellate Section, Robert A. Bernstein, Gilbert S. Rothenberg, Stuart E. Seigel, Chief Counsel, I. R. S., Washington, D. C., for respondent-appellee.

Before HILL, RUBIN and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

Taxpayers appeal a decision of the Tax Court upholding the Commissioner's assessments of deficiencies in their federal income tax. Taxpayers argue that the Tax Court erroneously concluded that taxpayers failed to prove the normal incidents of agency between a controlled corporation and a limited partnership in which they were partners. They maintain that the criteria formulated in *National Carbide Corp. v. Commissioner of Internal Revenue*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949), for determination of the agency status of a corporation have been met. We agree with the Tax Court that taxpayers have not

carried their burden of proof, and therefore we affirm.

## FACTS

The facts of this case are essentially undisputed. In 1969, taxpayers formed a limited partnership, San Mateo Properties, Ltd. (hereinafter referred to as Mateo Partnership or simply as the partnership), for the purpose of developing and operating an apartment complex in the Dallas, Texas, area.[1] Dr. George M. Jones had acquired the land by 1971 and contributed it to the partnership. In exchange for this contribution, Dr. Jones became general partner, receiving a 75% interest in the profits and losses of the partnership. The remaining taxpayers contributed money to the partnership and each received, as a limited partner, a 5% interest in the partnership profits and losses.

In 1971, Mateo Partnership began the task of securing permanent financing for the complex. A mortgage broker placed the partnership in contact with First Mortgage Investors of Miami, Florida ("FMI"), and Lakewood Bank and Trust ("Lakewood"). During negotiations, the lending institutions informed Dr. Jones that they would be unable to consummate the permanent loan commitments with the partnership since the usury laws of Texas limited interest rates to individuals and partnerships. The lending institutions agreed to make the loan only to a corporation. In light of this information, the application for permanent financing to FMI was made in February, 1973, in the name of San Mateo Properties, Inc. (hereinafter referred to as Mateo Corporation or simply as the corporation), even though the corporation had not yet been formed. In March, 1973, FMI thereupon executed a permanent loan commitment in the name of the corporation, to

be guaranteed by Dr. Jones. Three amendments to this permanent loan commitment were made shortly thereafter, all in the name of the corporation. A letter of credit was obtained from Lakewood to make up the projected deficit in the permanent loan commitment from FMI.

After permanent financing had been secured, Mateo Partnership sought interim financing through a second mortgage broker. This broker placed the partnership in contact with Texas Bank and Trust ("Texas Bank"). The loan application to Texas Bank was in the name of the partnership. Texas Bank approved the interim financing, but on condition that the loan would be made to a corporation and not to the partnership. The loan officer in charge of this loan testified that, at the time the application was made, he understood that the corporation was in existence or would be formed. He also testified that he did not know whether the corporation was acting as agent for the partnership.

On June 1, 1973, the corporation signed[2] a promissory note to Texas Bank in the amount of $2,700,000. This loan was guaranteed personally by Dr. Jones and his wife.

In conjunction with this loan, Dr. Jones entered a construction contract on June 1 with Campbell Bros., Inc. The contract indicated that Dr. Jones personally owned the land, without any indication that the property was owned either by the partnership or the corporation. At Texas Bank's requirement, this contract was reframed to be between Campbell Bros. and the corporation. Because the contract price and certain allowances were considered too high, Texas Bank required another contract be entered between the corporation and Campbell Bros. adjusting the price and allowances.[3] Unknown to Texas Bank, Dr. Jones and Campbell Bros. entered a letter agree-

---

1. Taxpayers Shields O. Livingston and Donald E. McGuire became limited partners of the partnership for the first time during the taxable year 1973. An additional limited partner did not join in this suit.

2. Where we indicate the corporation signed a document, it is always by Dr. Jones. Dr. Jones occasionally would indicate his position as president and occasionally would not.

3. The two construction contracts entered into by the corporation were also dated June 1, 1973, although it is clear that they each were executed several days apart.

ment on July 20, 1973, indicating they both considered the original contract to be the only valid contract between them.

On June 26, 1973, Dr. Jones and the limited partners formed Mateo Corporation. The business purpose of the corporation was broad and was not limited to functioning as a partner. Dr. Jones and the limited partners became the sole shareholders of the corporation.[4] The sole officers and directors of the corporation were Dr. Jones, Dr. Jones' wife and a limited partner.

At the first meeting of the Board of Directors on June 29, 1973, three resolutions were adopted authorizing Mateo Corporation to join Mateo Partnership as general partner, to enter into a construction contract with Campbell Bros., and to borrow money for interim financing from Texas Bank. The latter two resolutions did not disclose the corporation's capacity as general partner.

On the same day as the first meeting of the Board of Directors of Mateo Corporation, the Mateo Partnership agreement was amended to admit Mateo Corporation as an additional general partner.[5] The corporation made no capital contribution to the partnership. The corporation had the sole authority to execute contracts and change orders with respect to the construction of the apartments. The corporation also had authority to make all decisions concerning the operation and management of the apartments and to employ agents and other third parties on behalf of the partnership. Title to all partnership property was to stand in the corporation's name without disclosure of the fiduciary capacity in which it held the property. The corporation was given authority to execute loan documents for interim and permanent financing in its own name without disclosing the fiduciary capacity in which it was acting. In return for these services to the partnership, the corporation was to receive 30% of the partnership's net profits, excluding capital gains.[6] The corporation was not to share in any of the partnership's losses, and all partnership losses were to be carried forward without limit as to time in determining the corporation's share of net profits.[7] By a

---

4. The corporation's tax returns indicate Dr. Jones owned 80% of the stock.

5. There is no indication in the record that an amended certificate of limited partnership showing the corporation as general partner was ever filed in the public records. *See* Tex. Civ. Code Ann. Art. 6132a, § 3(a) (Vernon 1970).

6. The remaining partners' shares in net profits were adjusted to pro rata shares of the remaining 70% of net profits.

7. The pertinent provisions of the amended partnership agreement affecting the corporation's powers and compensation read:

7.1 *Construction and Management of Apartments.* The Corporate General Partner agrees to construct, or cause to be constructed, upon the Partnership's real estate, apartment buildings and related buildings and improvements substantially in conformity with plans and specifications which have been prepared, as the same may be changed or modified hereafter, and upon completion of such apartments and improvements to operate, manage, rent, lease, and maintain such improvements. The Corporate General Partner shall have the sole power and authority to execute contracts, change orders, and all other documents as may be necessary or convenient to construct such improvements on the real estate owned by the Partnership. The Corporate General Partner shall have the power and authority to make all decisions concerning acquiring the real estate, zoning, plans with architects and other consultants, constructing, closing, operating and managing the apartments project, and to employ such agents, consultants or third parties as in the unrestricted judgment of the Corporate General Partner may be necessary or convenient to construct and operate the apartments, and to pay such agents, consultants and third parties reasonable and customary fees or other compensation.

7.2 *Title to Partnership Properties.* The title to all partnership property, real, personal and mixed, wherever located, shall be vested and stand in the name of the Corporate General Partner, without disclosing the fiduciary capacity in which it holds said properties.

7.3 *Financing.* The Corporate General Partner shall have the right to borrow, for and on behalf of the Partnership, in its own name or in the name of the Partnership, as it may elect, such sums of money, from time to time, as the Corporate General Partner shall deem necessary or convenient to enable it to construct, equip and furnish the proposed improvements and to operate the same, which borrowings may be interim, stand-by, or permanent, and may be for such periods of time and in [sic] at

deed dated July 2, 1973, the partnership conveyed the realty to the corporation, without disclosure of the fiduciary capacity of the corporation.

On July 20, 1973, the first advance on the interim loan was made to Mateo Corporation and construction began. In the course of the construction, numerous change orders in the design were executed, which reflected the corporation as the owner.

During 1974 and 1975, while the complex was being built, Texas Bank would present on a monthly basis interest costs to Dr. Jones in his capacity as president of the corporation. Texas Bank would lend additional amounts to the corporation to satisfy the interest payments by depositing the appropriate amount each month in the corporation's account. Dr. Jones would then issue a corporate check payable to Texas Bank in the amount of interest due that particular month.

All did not go well with the construction of the complex. On January 10, 1975, after Campbell Bros. had not completed the complex on schedule, Mateo Corporation informed Campbell Bros. and the surety company that it intended to take over the construction site in seven days. On January 13, 1975, the corporation advised the surety company that Campbell Bros. was in default, and requested the surety to perform its obligations under the performance bond. Evidently, the surety company refused to complete the project. Mateo Corporation thereupon borrowed an additional $1 million from Texas Bank and secured an extension on repayment of the original loan. These additional documents were executed by the corporation. On October 9, 1975, Texas Bank sent a letter to the corporation declaring the interim loans in default and initiating foreclosure proceedings.

Despite the difficulties in completing the complex, some apartments were nevertheless leased. These leases were with Mateo Partnership and rents were deposited in Mateo Partnership's account. Operating expenses for the complex were paid by the partnership.

For the tax years 1973, 1974 and 1975, Mateo Corporation filed a Form 1120, Corporation Income Tax Return, reflecting its principal business activity to be real estate investment. Each of the corporation's returns showed no gross receipts or income and reflected no interest expense or operating expense. The partnership returns for these years showed an ordinary loss for each of these years, the bulk of which represented interest expenses, with some business expenses from the operation of the complex. Each of the taxpayers claimed their distributive share of the loss reported by the partnership. Because Dr. Jones suffered a net operating loss in the taxable year 1974, he carried the loss back to his taxable years 1971 and 1972 and sought a refund based on the results of the carryback. In addition, Dr. Jones included in the carryback an unused investment credit for the taxable year 1974.

such interest rates and upon such other terms as the Corporate General Partner, in its sole discretion, shall determine. To secure payment of such sums, the Corporate General Partner may give and grant, for and on behalf of the partnership, in its own name, without disclosing the fiduciary capacity in which it acts, or in the partnership name, as it may elect, such deeds of trust, mortgages, pledges, security agreements, mortgage assignments, indentures, and other security agreements and assurances as may be reasonably necessary or convenient to obtain and secure such borrowings. All such borrowings may be refinanced by the Corporate General Partner from time to time as it shall deem appropriate.

7.4 *Compensation of the Corporate General Partner.* For its services in constructing, financing, operating and maintaining such improvements on the Partnership property, the Corporate General Partner shall be entitled to receive compensation in an amount equal to thirty (30) per cent of the Partnership's net profits, which compensation shall be paid to it not less frequently than annually. Such "net profits" shall be determined in accordance with generally accepted accounting principles applicable to the preparation of Federal income tax returns. Provided, however, that in determining such "net profits" there shall be excluded any capital gains realized by the partnership. The Corporate General Partner shall not be responsible for nor share any of the Partnership's losses, provided, however, that all such Partnership losses shall be carried forward, without limit as to time, in determining the Corporate General Partner's share of net profits.

The Service in its statutory notices of deficiency, determined that Mateo Partnership was not entitled to deduct interest and business expenses for the taxable years in issue. The basis of the Service's determination was that the apartment complex to which the expenses related was owned and operated by the corporation. The Service further determined that the rental income from the operation of the apartment complex was not includible in the gross income of the partnership for the same reasons. Correspondingly, the Service determined that taxpayers were not entitled to deduct their pro rata shares of partnership losses which related to the interest and business expenses reported by the partnership. The Service increased taxpayers' taxable income for their respective taxable years to the extent of the interest and business expenses and decreased their taxable income to the extent of the rental income the partnership reflected in calculating its ordinary income for the taxable years 1974 and 1975. In addition, the Service made appropriate adjustments for Dr. Jones' taxable years 1971 and 1972, resulting from the elimination of his net operating loss carryback from 1974. The investment credit carryback likewise was denied by the Service.

The Tax Court agreed with the Service. It held that under the test of *Moline Properties v. Commissioner*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), Mateo Corporation was formed for a business purpose and conducted business activity, and there-

fore had to be recognized as a separate taxable entity. As a separate taxable entity, only the corporation was entitled to the business and interest expenses deductions. The Tax Court also rejected the taxpayers' argument that Mateo Corporation was acting as an agent for Mateo Partnership. Applying the test of *National Carbide Corp. v. Commissioner, supra*—that for a corporation to be a true agent its relationship with its principal must not be dependent on the fact that it is owned by the principal—the Tax Court held that the taxpayers had failed in their burden of proving the normal incidents of an agency relationship between the partnership and the corporation.

## APPLICABLE LAW

The bulk of the Tax Court's opinion addresses the question of whether or not Mateo Corporation should be disregarded as a separate taxable entity. We have no quarrel with the Tax Court's conclusion that numerous Supreme Court, Fifth Circuit, and Tax Court decisions have established beyond peradventure that Mateo Corporation cannot be disregarded;[8] however, that is not an issue in this case. Taxpayers here do not seek, nor did they seek below, to disregard Mateo Corporation; nor do they argue that it should be treated as a sham or fictitious entity.[9] Taxpayers acknowledge, and indeed insist, that Mateo Corporation should be recognized. Taxpayers' argu-

---

**8.** See *Moline Properties, Inc. v. Commissioner of Internal Revenue*, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); *Evans v. Commissioner of Internal Revenue*, 557 F.2d 1095 (5th Cir. 1977); *Collins v. United States*, 386 F.Supp. 17 (S.D.Ga.1974), aff'd. per curiam, 514 F.2d 1282 (5th Cir. 1975); *Britt v. United States*, 431 F.2d 227 (5th Cir. 1970); *Greer v. Commissioner of Internal Revenue*, 334 F.2d 20 (5th Cir. 1964); *Tomlinson v. Miles*, 316 F.2d 710 (5th Cir.), cert. denied 375 U.S. 828, 84 S.Ct. 71, 11 L.Ed.2d 60 (1963); *Strong v. Commissioner of Internal Revenue*, 66 T.C. 12 (1976), aff'd. without opinion 553 F.2d 94 (2d Cir. 1977); *Bolger v. Commissioner of Internal Revenue*, 59 T.C. 760 (1973), acq. 1976–1 C.B. 1; *Estate of Philip Lichstein*, 1962 T.C.M. ¶ 62,252 (P–H, 1962).

See also from other circuit courts: *Foglesong v. Commissioner of Internal Revenue*, 621 F.2d 865 (7th Cir. 1980); *Ogiony v. Commissioner of Internal Revenue*, 617 F.2d 14 (2d Cir. 1980), cert. denied —— U.S. ——, 101 S.Ct. 269, 66 L.Ed.2d 130 (1980); *Harrison Property Management Co. v. United States*, 201 Ct.Cl. 77, 475 F.2d 623 (1973), cert. denied 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974); *Carver v. United States*, 412 F.2d 233 (Ct.Cl. 1969); *Given v. Commissioner of Internal Revenue*, 238 F.2d 579 (8th Cir. 1956).

Compare *Paymer v. Commissioner of Internal Revenue*, 150 F.2d 334 (2d Cir. 1945).

**9.** The Tax Court below was understandably misled because the courts have not sharply distinguished the fictitious entity argument from the agency argument relied upon by taxpayers in this case.

ment is that Mateo Corporation is the corporate general partner of the limited partnership, that the partnership is the equitable owner of the real estate, and that Mateo Corporation properly held legal title, and performed other partnership functions, in its own corporate name without disclosing the fiduciary capacity. Taxpayers argue that the Service has recognized the form taxpayers adopted only partway; that is, taxpayers argue that the Service seeks to recognize the establishment of the corporation, but to disregard the status of the corporation as general partner in the limited partnership.

The issue before this court is whether the alleged relationship—i. e., Mateo Corporation as an undisclosed general partner of the limited partnership—shall be recognized for tax purposes despite legal title lying in Mateo Corporation.

■ When a taxpayer seeks to establish an agency relationship with a controlled corporation, the standards against which we test this relationship are established by the Supreme Court case, *National Carbide Corp. v. Commissioner of Internal Revenue*, 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 779 (1949).[10] There a parent corporation entered into a contract with its four subsidiary corporations establishing each subsidiary as agent for the parent. The parent was to furnish working capital, management, and office facilities to the subsidiaries. In return, the subsidiaries were to turn over to the parent all profits in excess of 6% of the outstanding capital stock of the subsidiaries, which was nominal. The subsidiaries held title to the assets they used; the assets were purchased with monies advanced by the parent, which advances were shown on the subsidiaries' books as accounts payable to the parent. Those assets were worth nearly $20 million, and the number of employees of the subsidiaries was in the thousands. The Supreme Court held that the subsidiaries could not be

deemed agents of the parent for tax purposes because the business arrangement between the parent and subsidiary arose only because the parent owned and completely dominated the subsidiaries. 336 U.S. at 438, 69 S.Ct. at 734. However, the Court made it clear that a wholly-owned corporation could be deemed an agent for tax purposes where the usual incidents of an agency relationship exist:

> Whether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent.

336 U.S. at 437, 69 S.Ct. at 734 (footnotes omitted).

This circuit has rejected a similar agency argument in a case with facts quite close to those in the instant case. *Collins v. United States*, 386 F.Supp. 17 (S.D.Ga.1974), *aff'd. per curiam* 514 F.2d 1282 (5th Cir. 1975). In that case, tenants-in-common formed a corporation in order to avoid usury laws and to obtain interim and permanent financing for an apartment complex. The corporation had power to invest, develop and sell land in general, and was not limited to acting as agent. The co-tenants executed an agreement among themselves that the corporation would have power only to conduct activities required by the lender bank, would hold title as trustee only, would take no action other than that directed by the co-tenants, and the Board of Directors would

---

**10.** See Kronovet, *Straw Corporations: When Will They be Recognized; What Can and Should be Done,* 39 J.Tax. 54 (July, 1973), and Baker and Rothman, *Straw Corporations: New Cases Shed Light on Tax-Recognition Criteria,* 45 J.Tax. 84 (August, 1976), for surveys of cases in which legal title has been placed in a corporation and yet individual taxpayers argue that the corporation should be regarded as a sham or an agent.

have no authority except that required by law and the lenders. The corporation executed an agreement acknowledging its limited purpose and its duty to reconvey legal title as soon as consistent with the requirement of the lenders. The corporation executed the loan documents for the interim loan. This loan was guaranteed by the co-tenants as individuals. The construction contract was executed by the co-tenants. The corporation conducted no business activity other than maintaining a bank account to pay various construction expenses. Despite the fact that loan documents were signed by a purported officer of the corporation, no stock was issued, no meeting of stockholders was held, and no directors ever elected. The corporation filed no tax returns. The taxpayers asserted, and the court did not dispute, that the lenders were aware they were dealing with the individuals and not the corporation. The district court, nevertheless, concluded the corporation was not an agent because its relationship to its principal was dependent on the fact that it was owned by the principal. This circuit affirmed. 514 F.2d at 1283, n.2.

Although the relationship in the instant case is that of a controlled corporate general partner to the limited partnership, as opposed to the alleged agency relationship in *National Carbide* and *Collins*, we think that the same standards apply.[11] Taxpayers do not seriously argue to the contrary.

■ The burden of proving that the partnership relationship existed with respect to the ownership of the apartment complex is upon taxpayers. *Northern Natural Gas Company v. Commissioner of Internal Revenue*, 362 F.2d 781 (8th Cir. 1966). If conflicting inferences can be drawn from the evidence, the decision as to whether a partnership relationship existed for tax purposes is for the Tax Court. The findings of fact by the Tax Court will not be disturbed unless such findings are clearly erroneous.

*Northern Natural Gas Company v. Commissioner of Internal Revenue, supra; Greer v. Commissioner of Internal Revenue*, 334 F.2d 20 (5th Cir. 1964).

## APPLICATION OF THE NATIONAL CARBIDE STANDARDS

We discuss in turn the application to the instant facts of the six *National Carbide* factors.

The first factor is whether the corporation operates in the name and for the account of the partnership. The record on this point is mixed. While FMI, Lakewood and Texas Bank all knew that Dr. Jones was a partner of Mateo Partnership, and while these lending institutions were first approached by Dr. Jones as partner of the partnership, there is no evidence indicating that these lending institutions understood that the corporation with which they ultimately dealt was a partner in Mateo Partnership. The loan documents executed for interim financing during the construction period were in the name of Mateo Corporation without disclosure of any fiduciary capacity. The record reflects that Mateo Corporation consistently dealt with the surety without disclosure of its fiduciary capacity. Leases, however, were entered into in the partnership name, and operating expenses of the complex were paid by the partnership. While the evidence is unclear as to whether the contractor even knew the existence of Mateo Partnership, it is clear that the contractor assumed he was dealing with Dr. Jones individually as opposed to Mateo Corporation with whom two contracts were entered. Even if the contractor is included among those who knew the apartments were owned by Mateo Partnership, such knowledge would not serve to distinguish the cases which have applied the *National Carbide* standards. *Collins v. United States, supra* and *Harrison Property Management Co. v. United States*, 475 F.2d 623

11. Of course, application of the standards will be somewhat different. For example, in the instant case, we will inquire whether the corporate general partner here functions in a manner consistent with the normal duties of a corporate general partner, whereas the *National Carbide* inquiry related to the normal duties of an agent. Similarly, we note below that the third *National Carbide* factor is not relevant in the instant case.

(Ct.Cl. 1973), *cert. denied* 414 U.S. 1130, 94 S.Ct. 868, 38 L.Ed.2d 754 (1974), both involved partial disclosure of the true beneficial owner of property, and both found no agency status.[12]

 The second *National Carbide* element is whether the principal is bound by the alleged agent's actions. No party contests, and we conclude, that Mateo Partnership would be bound by all of the relevant actions of Mateo Corporation in the instant case. It is questionable, though, how much weight this element has in proving a true partnership relationship. Courts typically pass over this element, even though the facts in those cases give strong indication that the principal would be bound by the agent corporation's actions. *National Carbide v. Commissioner of Internal Revenue, supra; Collins v. United States, supra; Harrison Property Management Co. v. United States, supra.* The fact that the agency agreement is reduced to writing clearly is not conclusive that an agency relationship exists. *National Carbide v. Commissioner of Internal Revenue, supra; Collins v. United States, supra; Harrison Property Management Co. v. United States, supra; cf. Greer v. Commissioner of Internal Revenue, supra,* (where a factor in finding no agency was lack of a written document evidencing the relationship.)

With respect to the third factor—whether Mateo Corporation transmitted monies to Mateo Partnership—we find no evidence in the record pointing specifically in either direction. However, we do not believe this factor is relevant in the instant case. In the normal agency relationship, a corporate agent would be expected to transmit the monies it collects to its principal. On the other hand, a general partner charged with constructing and managing an apartment complex would not transmit monies on a regular basis. The record shows that there was no significant cash which could have been distributed to the partners during the years at issue.

The fourth factor in *National Carbide* is whether receipt of the income is attributable to employees or assets belonging to Mateo Partnership. Services of employees of Mateo Corporation are not a significant factor in this case. Although record title was in the name of Mateo Corporation, there is no evidence to contradict the conclusion that true ownership of the property was in the partnership. The Service does not dispute the fact that the corporation was authorized by the partnership agreement to hold the property in its name without disclosure of the fiduciary capacity. Although there is no dispute that Mateo Partnership owns the equitable title, this factor also has counted for little in prior cases. In cases where an agency argument was made, it was undisputed that equitable title was in the principal. Yet, the agency argument was rejected. *Collins v. United States, supra; Harrison Property Management Co. v. United States, supra. See also Bolger v. Commissioner of Internal Revenue,* 59 T.C. 760 (1973), *acq.* 1976–1 C.B. 1, (where agency argument rejected although facts strongly suggested equitable title in individuals). *See also Greer v. Commissioner of Internal Revenue, supra,* (where this circuit found no agency relationship in part because of ambiguity as to where true ownership of the leasehold involved there lay). Accordingly, we are bound to find that this element lends little weight to taxpayers' argument.

The fifth factor is whether Mateo Corporation's relationship with the partnership was dependent upon the fact that it was owned and controlled by the individual partners. Mateo Corporation was admittedly formed solely to obtain financing for the partnership and has performed no other business activity. The loan documents and construction contract had been signed in the

---

**12.** In *Collins v. United States, supra,* this circuit rejected the agency argument even though the alleged principals entered into a construction contract for the construction of an apartment complex with a general contractor. Also, in *Collins,* the taxpayers claimed the lender knew it was dealing with individuals despite the use of a corporation to execute loan documents. The district court in its opinion did not reject this claim. In *Harrison Property Management Co. v. United States, supra,* the corporation and individual shareholders joined in suits and in signing leases.

corporation's name even before formation of the corporation. The record shows that the corporate general partner here would receive no compensation until net profits exceed the cumulative past losses, and thereafter would receive 30% of the partnership's net profits exclusive of capital gains. Receipt of 30% of the net profits would be a significant fact in favor of recognition of the partnership relationship. Taxpayers, however, have placed in the record no evidence concerning the likely amount Mateo Corporation would receive, the length of time Mateo Corporation would have to wait before it would begin receiving its share of net profits, and, most significantly, the reasonableness of the 30% share. Taxpayers have produced no evidence to prove that the compensation payable to the corporate general partner was determined on an arms-length basis. Nor have taxpayers introduced any other evidence to prove that the relationship between the corporate general partner and the limited partnership was independent of the acknowledged ownership and control. Accordingly, we must conclude that taxpayers have failed to meet their burden of showing that Mateo Corporation's relationship with the partnership was an independent one.[13]

The last, but significant, criterion under *National Carbide* is whether Mateo Corporation's activities in the instant case are consistent with the normal duties of a general partner. Taxpayers have introduced no evidence in this regard. In particular, taxpayers have introduced no evidence to prove that corporate general partners commonly take title to real estate without disclosure of any fiduciary capacity.[14] We are mindful of the fact that the *National Carbide* test contains, as one of its factors, an inquiry into whether the agency was disclosed. There is no indication in this record that it is more common for a corporate general partner to act in an undisclosed capacity than for an agent to do so. Accordingly, we conclude that taxpayers have failed to carry their burden of proving that Mateo Corporation functioned in a manner consistent with the normal duties of a general partner.

■ In summary, we conclude that the taxpayers here have carried their burden of proof only with respect to the second and fourth *National Carbide* factors, *i. e.*, that the partnership would be bound by the corporate general partners' actions, and that the income of the partnership would be attributable to property equitably owned by the partnership. However, these two factors have been present in numerous cases which have nevertheless rejected the taxpayer's agency argument. In particular, these factors were present in the *Collins*

**13.** This *National Carbide* factor is in harmony with the general principles of tax law. Ownership and control of a corporate general partner by the limited partners of a limited partnership is a factor, under Treas.Reg. § 301.7701–2(d)(2), in determining whether such a partnership would be taxable as an association. In Rev.Proc. 72–13, 1972–1 C.B. 735, the Service announced it would not give advance rulings on whether a limited partnership with a sole corporate general partner qualified as a partnership for tax treatment if the limited partners owned directly or indirectly more than 20% of the corporate general partner or any affiliate. These rules reflect a concern about abuse of the tax laws by limited partnerships utilizing controlled corporations as general partners. *See Zuckman v. United States*, 207 Ct.Cl. 712, 524 F.2d 729 (1975). This fifth *National Carbide* factor reflects a similar concern, albeit in a different context. *See also Walter F. Maxwell*, 29 T.C.M. 1356 (1970); *Charles Turner*, 24 T.C.M. 544 (1965); *Noonan [v. C. I. R.]*, 52 T.C. 907 (1969), *aff'd. per curiam*, 451 F.2d 992 (9th

Cir. 1971); McKee, Nelson and Whitmire, *Federal Taxation of Partnerships and Partners*, ¶ 3.04[2] (1977), suggesting that situations involving a shareholder entering into a partnership with a controlled corporation will be closely scrutinized, but will be recognized where both the shareholder and the corporation perform necessary and substantial functions or both have substantial, separate capital interests at stake in the venture.

**14.** Taxpayers do cite four cases in which the Board of Tax Appeals stated that, although legal title to property was in the name of an individual partner, such property may nevertheless be deemed to belong to the partnership: *W. H. Simmons*, 22 B.T.A. 1106 (1931), *acq.* X–2 C.B. 65 (1931); *Frank E. Eyestone*, 12 B.T.A. 1232 (1928), *acq.* VII–2 C.B. 12 (1928); *Lewis Dill*, 3 B.T.A. 65 (1925), *acq.* IV–2 C.B. 2 (1925); *Theodore Levin*, 7 B.T.A.M. ¶ 38,105 (1938).

case, a previous decision of a panel of this court, which is binding upon us, and which rejected the agency argument. With respect to the first *National Carbide* factor, the evidence here is no more favorable to the taxpayer than was the evidence in *Collins*. We noted above that the third *National Carbide* factor is not relevant in the corporate general partner-limited partnership context of this case. Since taxpayers have failed to produce any evidence with respect to the crucial fifth and sixth *National Carbide* factors—whether the relationship was arms-length and independent, and whether the corporate general partner functioned in a manner consistent with the normal duties of a general partner—we have no sound basis on which to distinguish the *Collins* case. Accordingly, we conclude that taxpayers have failed to carry their burden of proof with respect to the *National Carbide* standards.[15]

AFFIRMED.

---

**15.** Because we find for the Service on the agency issue, and because the court below did not address the Service's argument that the interest deductions for the taxable years 1974 and 1975 are not deductible under this circuit's *en banc* decision, *Battelstein v. Internal Revenue Service*, 631 F.2d 1182 (5th Cir. 1980), we find no need to address the applicability of *Battelstein* to the instant facts.