GEORGE W. HEATON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Heaton v. Commissioner
Docket No. 11901-86
United States Tax Court
T.C. Memo 1989-459; 1989 Tax Ct. Memo LEXIS 459; 57 T.C.M. (CCH) 1412; T.C.M. (RIA) 89459; August 28, 1989
Robert O. Rogers, Jerald David August, David E. Bowers, and W. Glenn Dempsey, for the petitioner. Claudine Ryce and W. Robert Abramitis, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in and additions to petitioner's Federal income tax for the years and in amounts as follows: Additions to Tax
Year
Amount
Section 6653(a)(1) [1]
Section 6653(a)(2)
1980
$ 313,108
$ 15,655
-
1981
$ 180,148
$  9,007
50% of the interest
due on $ 180,148
Respondent *460 also determined that the $ 313,108 and $ 180,148 represented substantial underpayments attributable to tax motivated transactions under section 6621(d) but this issue was conceded at trial by respondent. After concessions, the issues remaining for decision are (1) whether certain losses claimed by petitioner on his returns for 1980 and 1981 should be treated as those of Sea Garden Resort Corporation and Heaton Hotel Corporation or of a joint venture which petitioner claims existed in those years; (2) if the joint venture existed, whether it was a partnership as contended by petitioner or an association taxable as a corporation as contended by respondent; (3) if the venture was a partnership, whether petitioner was a partner in that partnership; (4) if the venture was a partnership in which petitioner was a partner, whether the interest and guaranteed payments accrued by the partnership are deductible in computing the partnership's income or loss and petitioner's distributive share of such income or loss; and (5) whether petitioner negligently underreported his income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits *461 are incorporated herein by reference. At the time his petition was filed, petitioner was a resident of Hillsboro Beach, Florida. He filed individual income tax returns for the calendar years 1980 and 1981 with the Internal Revenue Service Center, Atlanta, Georgia. In 1980 and 1981 and for some time prior thereto petitioner was engaged in the acquisition of rental apartments and their conversion to condominiums. In such acquisitions he attempted to purchase a particular property for approximately 60 percent of what he estimated he could sell it for after it was converted to condominiums. Of the remainder of the selling price he estimated about one half or 20 percent would be needed for improvements and selling expenses and the other 20 percent would be profit. In a typical venture petitioner would first place a targeted property under a contract to purchase and then contact a prospective investor with an offer to enter into an agreement under which the investor would provide cash and/or credit and upon completion of the venture would be entitled to recover his investment with interest plus a percentage, usually 50 percent of the profits or losses. In January of 1980, Karan Corporation, *462 an entity wholly owned by petitioner, entered into a contract to purchase on or before July 8, 1980 certain rental property in Pompano Beach ("Pompano Property") from Edwin Seese ("Seese") for $ 6,500,000. The property, containing approximately seven acres of land, was divided into three general areas known and described as follows: (1) the "Sea Garden" consisting of 52 efficiency apartments located on 250 feet of beach; (2) the "Sea Garden Resort," a 55 unit motel with a restaurant and lounge, located immediately across Highway A1A from Sea Garden; and (3) the "Waterfall Apartments," located immediately to the west of Sea Garden Resort and consisting of a beach club, 40 apartments, 14 tennis courts with two pro shops, two pools, two duplexes, and a single family residence. When the contract to purchase was entered into, petitioner believed that the property could be converted into condominiums and sold for $ 11,000,000 to $ 12,000,000. Thus, petitioner felt that the property fell well within the parameters of a potentially successful venture. At the suggestion of his real estate agent petitioner met with Frank Gardner ("Gardner") to discuss the possibility of Gardner and his *463 associate John Driscoll ("Driscoll") becoming investors in the conversion of the Pompano Property. Gardner, however, stated that the possible return on a conversion to condominiums did not appear to be sufficient for him and Driscoll to invest in the project. Gardner suggested that petitioner consider a conversion of the property to a time-share arrangement since many Europeans were then visiting Florida due to the low value of the dollar in relation to European currencies. Pursuant to this suggestion petitioner, Gardner, and Driscoll began a study of the time-share market, which included a trip to New England by the three of them to observe the operation of a successful time-share project and a trip to Europe to discuss the marketing of time-share units with travel agencies. The study also included the preparation by Laventhol & Horwath, C.P.A.s, of a report on the rental units on the Pompano Property labeled "Proposed Timesharing Entity Financial Projections." The concept of converting the Pompano Property to a timeshare project was also discussed by petitioner, Gardner and Driscoll with members of the Solar family, an old, well established family from El Salvador with world *464 wide investments and many international connections. Prior to their participation in the Pompano venture Gardner and Driscoll had become acquainted with the Solars during an unsuccessful attempt to purchase another resort in southern Florida, and were aware that the Solars were interested in making investments in south Florida real estate. The discussions with the Solars apparently led to an informal agreement or general understanding between petitioner, Driscoll and Gardner on one hand and the Solars on the other under which the capitalization of the acquisition and development of the Pompano Property into a time-share project was to be obtained with a letter of credit from the Solars in the amount of $ 2,500,000, a loan to be arranged by the Solars from a foreign bank for $ 5,000,000 which was to be secured by a first mortgage on the Pompano Property, and a cash contribution by Driscoll in the amount of $ 1,500,000. The group employed Alan R. Hecht, a tax attorney, to assist them in the formulation of a plan or structure for the development and operation of the property that would satisfy both the Solars (referred to as the foreign investors) and petitioner, Driscoll and Gardner *465 (referred to as the U.S. investors). Each group of investors was to have a 50-percent interest in the project. Hecht's plan, set forth in a memorandum dated June 9, 1980, envisioned a complicated structure for the project which included the use of Sea Garden Resort Corporation, a new Florida entity which had been incorporated on April 22, 1980, plus two Antilles corporations, one Dutch corporation and one Panamanian corporation. For some period of time the parties attempted to follow the plan developed by the tax attorney and at least one of the additional corporations contemplated by the plan was organized but not activated because the Solars apparently lost interest in the venture and never made their part of the financial arrangements. When it became apparent that the Solars were not going to participate in the venture (at least not before July 8, 1980, the closing date specified in the contract to purchase) petitioner, Gardner, and Driscoll undertook to proceed without them. At this time they discussed the possibility of organizing a general partnership to own, develop, operate, and eventually sell the Pompano Property but for reasons hereinafter set forth no formal partnership *466 agreement was executed by the parties. It was agreed, however, that petitioner would have a 50-percent interest in the overall venture; Driscoll would have a 45-percent interest; and Gardner a five percent interest. Because his interest in the venture was so small Gardner requested that he be permitted to hold his interest in a corporation in order to avoid individual liability as a partner. Since petitioner and Driscoll had no objection to Gardner's request, and since a corporate charter had already been obtained for Sea Garden Resort Corporation, the parties orally agreed that the corporation would hold Gardner's five percent interest and all of the corporation's outstanding stock would be issued to him. The parties also orally agreed that Sea Garden Resort Corporation would take and hold title to the Pompano Property. On July 1, 1980, all of the stock in Sea Garden Resort Corporation was issued to Gardner, but petitioner and Wallace Kennedy, the attorney for Sea Garden Resort Corporation, were officers of the corporation together with Gardner because it was understood that Gardner was not going to be available on a day to day basis to execute corporate documents. Karan Corporation's *467 contract to purchase the Pompano Property for $ 6,500,000 was assigned to Sea Garden Resort Corporation and Sea Garden Resort Corporation applied to Little Marais Trading Company ("Little Marais") for a loan of $ 5,000,000 to be secured by a first mortgage on the Pompano Property and a personal guarantee by Driscoll. Little Marais was an inactive corporation owned by Driscoll's children. Driscoll was its president and Gardner was its vice-president. On July 1, 1980 Little Marais with Driscoll's personal guarantee borrowed $ 5,000,000 on a note payable to the First National Bank of St. Paul. In exchange for a note payable secured by Driscoll's personal guarantee and a first mortgage on the Pompano Property, Little Marais loaned the same amount to Sea Garden Resort Corporation. Both notes were payable on July 1, 1982 with interest being payable annually at 11.375 percent. With personal guarantees by Driscoll and petitioner another $ 2,500,000 was borrowed by Sea Garden Resort Corporation on a note payable to the Nassau branch of the First National Bank of St. Paul, where Driscoll was a director. On July 1, 1980 Seese delivered a warranty deed to the Pompano Property to Sea Garden *468 Resort Corporation in exchange for $ 6,500,000. On July 2, 1980 the warranty deed was recorded with the Clerk of the Broward County Circuit Court. Also on July 1, 1980 Sea Garden Resort Corporation executed and delivered the promissory notes to Little Marais and the Nassau Branch of the First National Bank in the respective amounts of $ 5,000,000 and $ 2,500,000. The first note was secured by a first mortgage on the Pompano Property and a conditional assignment of the rentals from the property which were recorded with the County Administrator of Broward County on July 7, 1980. The second note was secured by the personal guarantees of petitioner and Driscoll. On July 2, 1980 title insurance was issued on the Pompano Property in the name of Sea Garden Resort Corporation. As indicated hereinbefore, the parties had prior to closing the purchase of the Pompano Property discussed the possibility of organizing a general partnership to own, develop, operate and eventually sell the Pompano Property but had not entered into a formal partnership agreement. From time to time after the purchase was closed the parties also discussed the possibility of entering into such a partnership agreement *469 and finally in March of 1981 a draft of a partnership agreement was prepared by Kennedy. Prior to and during the drafting of this agreement Kennedy met with the parties on different occasions and during such meetings they orally agreed upon the formation of a partnership along the lines previously outlined herein. In other words it was understood by the parties that petitioner would have a 50-percent interest in the partnership and Driscoll would have a 45-percent interest while Gardner would have a five percent interest which would be held by Sea Garden Resort Corporation. The agreement prepared by Kennedy in March of 1981 was never executed even though it apparently included various oral understandings the parties had reached with respect to actions taken in the past as well as actions contemplated for the future. For instance, the proposed agreement provided that Driscoll would be responsible for advancing $ 2,500,000 to the venture as capital or as a loan; that $ 5,000,000 would be borrowed by Sea Garden Resort Corporation from a third party which loan would be personally guaranteed by all of the parties if required by the lender; that the venture would acquire Karan Corporation's *470 right to purchase the Pompano Property and reimburse Karan Corporation for its deposit under the contract to purchase; that title to the Pompano Property would be held in the name of Sea Garden Resort Corporation for the benefit of the partnership or joint venture; and that petitioner would be responsible for the day to day management of the project for which he would receive no compensation. Even though the agreement was never signed petitioner undertook responsibility for the day to day business activities but met regularly with the other parties to make decisions with respect to policy matters. In March of 1981 and from time to time both before and after that date the parties discussed and gave consideration to the possibility of transferring title to the Pompano Property to a partnership. No such transfer was ever made however because it would have involved significant legal and recording costs and would have created considerable difficulties in executing documents. Furthermore even though title to the property remained in Sea Garden Resort Corporation the parties never executed a formal agreement that the corporation was holding title to the property for the purpose of securing *471 financing or that Sea Garden Resort Corporation would convey, assign or encumber the property and disburse any proceeds received in a manner directed by the parties. However, apparently because of Driscoll's substantial risks the parties did execute an agreement under which Gordon Head ("Head"), Driscoll's personal attorney, was authorized to hold the stock of Sea Garden Resort Corporation in escrow and to transfer all such stock to Driscoll if Sea Garden Resort Corporation defaulted on either of the outstanding loans. Prior to closing the purchase of the Pompano Property, the parties learned that under Florida law all individuals, corporations, and/or partnerships having more than a ten percent interest, directly or indirectly, in property on which liquor was to be sold had to be identified on any application for a liquor license with respect to such property. Furthermore, the licensing agency could require the fingerprinting of all such persons. Upon learning of these requirements the parties decided to organize a separate corporation to own the liquor license. Consequently on June 30, 1980, petitioner obtained a charter for Heaton Hotel Corporation ("Hotel Corporation") and *472 applied to the liquor control board for permission to transfer the liquor license to it from Seese. However, petitioner was advised by the liquor control board that the permit could not be granted unless Hotel Corporation had an economic interest in the property such as that reflected in a lease. To comply with this requirement, Sea Garden Resort Corporation executed a lease to Hotel Corporation and on July 9, 1980, Seese assigned to Hotel Corporation all of his permits, licenses and governmental approvals in connection with the Pompano Property. On September 8, 1981, a notice was published in a local newspaper that Hotel Corporation was doing business as Sea Garden Beach and Tennis Resort. On September 16, 1981, Sea Garden Resort Corporation and Hotel Corporation, d/b/a Sea Garden Beach and Tennis Resort, were identified as the owners and developers of the Pompano Property in a replat of the Sea Garden Plat previously filed with the Broward County City Planning Board. The replat was accepted by the Board on December 16, 1981, and adopted as an ordinance by the City of Pompano Beach on February 19, 1982. Property taxes on the Pompano Property were paid by Hotel Corporation in *473 1981 and by Sea Garden Resort Corporation in 1982. All expenses incurred in the development and operation of the Pompano Property were paid from operating accounts maintained by Sea Garden Resort Corporation or Hotel Corporation. On October 30 and November 20, 1980, Sea Garden Resort Corporation gave Little Marais promissory notes for $ 100,000 and $ 400,000 respectively. On November 21, 1980, $ 100,000 was transferred to the account of Sea Garden Resort Corporation at the First National Bank in Palm Beach, Florida from the Nassau branch of the bank. On June 15, 1981, $ 300,000 was transferred from Little Marais to the account of Sea Garden Resort Corporation at the First National Bank in Palm Beach, Florida. In all instruments associated with these transfers Sea Garden Resort Corporation is described as the owner of the Pompano Property. The parties later attempted to pursue the marketing of time-shares but were unsuccessful due to an unreceptive market. The group then decided to operate part of the Pompano Property as a hotel and convert the balance to condominiums for wholesale in blocks of 10 units to Sea Garden Development Corporation ("Development Corporation"), which *474 would make retail sales of the condominiums in Canada. Development Corporation was organized by the parties in late 1981 and retail sales commenced in 1982. Although projections for this plan indicated a total retail sell-out of $ 10,000,000 to $ 11,000,000, excluding the hotel, all sales made to Canadians for small cash down payments plus mortgages for the balances were ultimately defaulted by the purchasers and the condominiums were repossessed. The venture continued to deteriorate to the point where the mortgage on the Pompano Property was in default and eventually petitioner assigned his entire interest in the venture to Driscoll in exchange for Driscoll's agreement to hold petitioner harmless from any liabilities. On his income tax returns for 1980 and 1981 petitioner claimed deductions in the total respective amounts of $ 579,749 and $ 720,593 for his distributive share of partnership losses incurred with respect to the Pompano Property. In his deficiency notice respondent determined that the deductions claimed by petitioner were not allowable because it had not been established that any partnership losses were incurred. In the event it is found that the losses in dispute *475 were incurred by a partnership or partnerships the parties have stipulated the correct amount of such losses and petitioner's distributive share of the losses. The parties have also stipulated that at all pertinent times, Sea Garden Resort Corporation was a viable and active corporation which performed business activities including holding title to real estate, executing mortgages and deeds of trust, entering into contracts in its own name, receiving income, incurring expenses, paying local property taxes and filing Federal income tax returns. They have further stipulated that Hotel Corporation was a viable and active corporation that entered into contracts in its own name, received income, incurred expenses, paid local property taxes and negotiated with vendors. OPINION The principal issue for decision in this case is whether the losses incurred in the acquisition and operation of the Pompano Property during the years 1980 and 1981 are attributable to Sea Garden Resort Corporation and/or Heaton Hotel Corporation, or to the individual participants through a partnership. For the purpose of resolving this issue, we assume without deciding that a joint venture existed among petitioner, *476 Driscoll, and Sea Garden Resort Corporation and/or Hotel Corporation; that the joint venture constituted a partnership; and that the partnership was not an association taxable as a corporation. In this connection, we note that the parties are in agreement that the two corporations were not shams and should be recognized as viable, separate entities engaged in business activities. We further note that because of the parties' stipulations it will not be necessary for us to resolve the subsidiary issues relating to the amounts of the losses. Respondent contends that Sea Garden Resort Corporation and Hotel Corporation and not the partnership were the taxable entities in this case because the corporations owned and managed the property. Respondent argues that the owner of the Pompano Property was not a partnership because no partnership agreement was ever signed; the ownership of the property by a partnership was not memorialized by any document; there is no document in which the individual parties agreed to be liable for the venture's debts; and the property was consistently represented to third parties as being owned by either Sea Corporation or Hotel Corporation. Thus, respondent *477 concludes that all losses connected with the Pompano Property are properly attributable to the corporations. Petitioner counters that under the facts involved in this case an oral general partnership was organized to manage the Pompano Property. He argues that title to the Pompano Property was taken in the name of Sea Garden Resort Corporation for the benefit of the partnership; that the business transacted by Sea Garden and Hotel Corporation was strictly for the benefit of the partnership; and that the parties operated within the terms of the oral partnership agreement which embraced the terms of the unsigned draft agreement and were responsible for all partnership debts through their personal guarantees of various loans. Thus, petitioner concludes that the partnership is the entity to which the tax consequences of the Pompano Property should be attributed, with the result that he is entitled to deduct his distributive share of the losses sustained by the partnership during the years in issue. For income tax purposes, gain or loss from the sale or use of property is attributable to the *478 owner of the property. Helvering v. Horst, 311 U.S. 112, 116-117 (1940); Commissioner v. Bollinger, 485 U.S. 340, (1988), slip opinion at 4. In this case, the issue is the same as that involved in Bollinger, namely, were the corporations merely agents of a partnership in respect to the Pompano Property so that the income and expenses in respect of such property should be attributed to the partnership and, through it, to the partners. The burden of proof is on petitioner. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). In Bollinger, the Court set forth a three-part test to be used in determining whether a corporation is a true agent, namely (1) whether the fact that the corporation is acting as an agent with respect to a particular asset is set forth in a written agreement at the time the asset is acquired; (2) whether the corporation functions as agent and not as principal with respect to the asset; and (3) whether the corporation is held out as the agent and not as the principal in dealings with third parties relating to *479 the asset. Commissioner v. Bollinger, 485 U.S. at , slip op. at 9; George v. Commissioner, 844 F.2d 225, 228-229 (5th Cir. 1988), affg. a Memorandum Opinion of this Court. Satisfaction of the test is mandatory. George v. Commissioner, supra at 228-229. [2]
In the instant case, the record contains no evidence of a written agreement which discloses that either corporation was acting on behalf of a partnership. Thus, petitioner fails to satisfy the first requirement of the Bollinger test. Similarly, petitioner has failed to prove that the funds relating to the Pompano Property were not owned and controlled by the corporations. In fact, both Sea Garden Resort Corporation and Hotel Corporation maintained their own bank accounts, and there is no evidence that a partnership bank account ever existed in respect of the Pompano Property. The management services of the hotel were performed by Sea Garden Resort Corporation and Hotel Corporation with no reference or mention to any party of any ownership by a partnership. Thus petitioner fails to satisfy the second *480 requirement of the Bollinger test. Finally, there is no evidence that any creditors, vendors, or contractors were aware of the purported agency status of the corporations. Therefore, petitioner has not met the third requirement of the Bollinger test. Petitioner seeks to avoid the impact of Bollinger by suggesting that different considerations should apply where a partner, in this case Sea Garden Resort Corporation, has title to and controls the property. We think that this fact has only peripheral, if any, relevancy. Cf. Jones v. Commissioner, 640 F.2d 745, 754 (5th Cir. 1981), affg. a Memorandum Opinion of this Court. Indeed, to accord any significant weight to such an element would increase the capacity of participants in activities of the type involved herein to manipulate their financial arrangements for tax purposes -- a factor considered important by the Supreme Court in Bollinger. See 485 U.S. at (slip opinion at 9). In sum, we hold that the losses relating to the Pompano Property are properly attributable to Sea Garden Resort Corporation and Hotel Corporation and not to a partnership. [3] Consequently, respondent's determination *481 that petitioner is not entitled to deduct a share of these losses is sustained. With respect to the additions to tax under section 6653(a)(1) and (2), we find from the record as a whole that petitioner has more than satisfied his burden of proving that under the circumstances involved in this case he was not negligent in the preparation of his returns for 1980 and 1981. Consequently respondent's determinations in this respect are not sustained. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See also O'Neal v. Commissioner, T.C. Memo. 1989-81↩.
3. O'Neal v. Commissioner, T.C. Memo. 1989-81; Greenberg v. Commissioner, T.C. Memo. 1989-12. Cf. Sundance Ranches, Inc. v. Commissioner, T.C. Memo. 1988-535↩.